## STAUNTON INDUSTRIAL LOAN CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.
### No. 4776.

Circuit Court of Appeals, Fourth Circuit.
June 10, 1941.

C. G. Quesenbery, of Waynesboro, Va., and James Mann, of Norfolk, Va., for petitioner.

John J. Pringle, Jr., Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen. and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before SOPER, DOBIE, and NORTHCOTT, Circuit Judges.

DOBIE, Circuit Judge.

This is a petition to review the decision of the United States Board of Tax Appeals (hereinafter called the Board), wherein there was a redetermination of deficiencies in the income and excess profit taxes paid by the Staunton Industrial Loan Corporation (hereinafter called petitioner). See 42 B.T.A. No. 153 (Oct. 22, 1940).

Inasmuch as petitioner specifically states in its brief that no objection is made to the Board's findings of fact, we will adopt with

but minor modifications the able summary of these facts found in the respondent's brief.

Petitioner is an industrial loan corporation, the purposes of which are set forth in its certificate of incorporation, and are, among other things, to carry on a general loan business and lend money to any person or firm to be repaid in periodical, weekly, monthly, or other installments, no loan to be made for a period longer than 10 years nor for a greater amount in the aggregate to any person than 20 per cent of the paid-in capital stock; to charge in advance a legal rate of interest upon the entire amount of the loan; to sell certificates of investment or similar obligations upon either the fully paid or partial payment system; to pay such rate of interest as may be fixed by its by-laws; to exercise all the general powers conferred by law upon corporations; to borrow money; to sell and dispose of bonds, notes and certificates of investments; to purchase and sell the capital stock and evidences of debt of other corporations; and to purchase or acquire shares of its own stock.

The petitioner accepts funds at interest from the public, including banks, and as evidence thereof issues certificates of investment or enters the amount in a passbook held by the customer, depending upon whether the amount is a final payment or an installment payment. The term "Certificate of Investment" appearing on the certificates was used to comply with statutes and regulations of Virginia governing industrial loan associations. Printed slips are used by customers to make deposits. The certificates of investment and passbooks used by petitioner contain notices of a right reserved by petitioner to require 30 and 60 days' notice, respectively, of withdrawal of funds. The petitioner does not accept checks drawn on accounts in other institutions and has no authority to accept deposits subject to check. Money paid to petitioner for the purchase of certificates of investment may be withdrawn at its place of business upon the presentation by the customer, properly executed, of a negotiable form of check furnished by petitioner for that purpose. These checks do not circulate like checks drawn on ordinary checking accounts, but if one of them, contrary to petitioner's regulations, is drawn by a customer payable to other than petitioner, it would be honored by the petitioner when presented by the endorsee at petitioner's place of business. Petitioner does not require its investors to present their passbooks when withdrawing funds from their accounts. Passbooks are used for the convenience of investors. Petitioner issues temporary receipts when amounts are deposited or withdrawn by an investor without his passbook. Such deposits and withdrawals are subsequently posted in the passbooks. The petitioner also accepts deposits in Christmas savings club accounts. Payments by petitioner of balances in the accounts are made by check. The rate of interest paid by petitioner on deposits is determined by its board of directors.

The petitioner makes loans to any one having acceptable credit or collateral. In 1936 it made several loans secured by its own stock. Loans are evidenced by printed forms of notes signed by the borrower. The petitioner does not have power to make loans for periods longer than 10 years. Borrowers at times repay loans by weekly, monthly, or semiannual installments. Petitioner imposes fines for defaults on loans. Its income is derived solely from loans. The business of petitioner consists of receiving investments and making loans and discounts.

The petitioner has never been short of cash and has always allowed withdrawals of funds without notice.

The words "Investment Department" appear on the face of petitioner's passbooks, which contain rules and regulations subject to which investments are received by petitioner. Pursuant to the statutes of Virginia and regulations governing industrial loan associations, the holder of the books is referred to in the rules and regulations as "investor" and the amounts turned over to the petitioner are referred to therein as "investments", except in one instance, when the word "deposits" is used.

The books of petitioner are audited at least once each year by an examiner from the office of the banking department of the Corporation Commission of Virginia. Commercial banks incorporated under the laws of Virginia are supervised by the same department. The report rendered on an examination made of petitioner's business as of the close of business March 7, 1936, discloses "deposits" of $298,639.40, consisting of the following items:

Certificate of investment (full
   paid) ..................... $ 17,000.00
Installment certificate of in-
   vestment .................. 277,320.40
Christmas savings club ....... 4,319.00

The examiners require petitioner to charge off all assets listed as worthless and to set up a 50 per cent reserve for accounts listed as doubtful and otherwise comply with suggestions made in their reports. The Corporation Commission of Virginia requires petitioner to render a report of its affairs and to publish the report in a newspaper whenever it issues a like call upon state banks. The amounts turned over to petitioner by its customers are called "Investments" in the statement of its condition issued by the petitioner on December 31, 1937.

In 1932 petitioner was informed by counsel for the Federal Reserve Bank at Richmond, Virginia, that it was eligible for membership in the Federal Reserve System. Petitioner is not a member of the Federal Reserve System. It does not act, and does not have the power to act, as fiduciary or trustee.

Section 104 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 854, states:

"(a) *Definition.* As used in this section the term 'bank' means a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks under section 11(k) of the Federal Reserve Act, as amended, and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions.

"(b) *Rate of tax.* Banks shall be taxable in the same manner as other corporations, except that they shall not be subject to the surtax imposed by section 14, and except that the normal tax imposed by section 13 shall be at the rate of 15 per centum instead of at the rates provided in such section."

In accordance with the provisions of this section, petitioner duly filed corporate tax returns for the years 1936 and 1937. The Commissioner of Internal Revenue (hereinafter called the Commissioner), however, concluded that petitioner was not a "bank" within the meaning of section 104 and he, accordingly, applied the surtax provisions (sections 13 and 14) of the statute to petitioner's undistributed net income for each of the taxable years. For 1936, a deficiency was thus determined of $3,597.73 in income taxes and $86.85 in excess profit taxes; for 1937, a deficiency of $2,712.91 in income taxes and $52.92 in excess profit taxes. The Board sustained the Commissioner's determination of a total deficiency of $6,450.41.

The Board concluded in its opinion "that to be entitled to the benefits of section 104 petitioner must show that it was organized and doing business as a bank under the laws of Virginia." (42 B.T.A. No. 153, at p. 6). It then stated that, under the applicable Virginia law, a marked distinction is made between "banks", on the one hand, and "industrial loan associations", on the other. The Board indicated that banks of Virginia are defined and regulated by a chapter known as the Banking Code, Chapter 164A of the Virginia Code of 1936, while industrial loan corporations are defined and regulated by Chapter 166A of the Virginia Code of 1936; that section 4149-(1) of the Banking Code provides that the term bank as used therein includes "banks of deposit and discount, savings banks, savings societies, savings institutions and trust companies * * *", while section 4149-(4) of the same code provides that corporations not lawfully engaged in the banking business may not use an office sign indicating thereon that such place is the office of a bank, nor may it use such letterheads as would indicate that it is doing business as a bank; that under section 4168(2) of Chapter 166A, relating to industrial loan corporations, every such association shall have as part of its title the words "industrial loan"; that, under section 4149(13) of the Banking Code, banks are prohibited from buying their own stock, while petitioner by the terms of its charter is expressly permitted to buy and sell its own stock; that, under section 4149(25), banks are limited as to the amount of interest they may pay, while petitioner under the terms of its charter may pay any rate of interest that it may fix under its by-laws; that, under section 4149(47), banks may not make loans to an individual borrower exceeding 15 per cent of their capital and surplus, while petitioner under its charter may make loans up to 20 per cent of its capital and surplus. In concluding its comparison of Virginia "banks" and Virginia "industrial loan associations", the Board stated in its opinion (42 B.T.A. No. 153, p. 8): "The distinction was definitely recognized by the General Assembly of Virginia

in 1934. It declared that 'The objects of an industrial loan association and a bank are hereby declared to be similar in nature' and authorized industrial loan associations chartered prior to January 1, 1934, to amend their charters to become 'a bank of discount and deposit and/or trust company' and retain the right to conduct the business of an industrial loan association. Sec. 4168 (37) (c). Petitioner never took advantage of the privilege granted by the act. The act was repealed in 1936. The petitioner was not incorporated and doing business as a bank under the laws of Virginia."

■ The laws of Virginia, for reasons which that State apparently thinks are compelling, draw a definite line between "banks" and "industrial loan associations". However, we do not believe that the peculiarities in individual state laws are controlling on this court in the interpretation of section 104. The purpose of Congress in enacting section 104 is succinctly stated in the Report of the Committee on Ways and Means, H.R. No. 2475, 74th. Cong.: "Banks and trust companies are not brought within the new plan, but pay a flat rate of 15 percent on their net income and domestic corporations in receivership are treated in the same manner. *This seems to be a wise public policy, since the surplus of banks must be built up for the protection of the depositors* and because receiverships in the vast majority of cases cannot, of course, pay dividends." (Italics added.)

Obviously, Congress recognized that it was "wise public policy" not to discourage the building up of reserves in banking institutions. The imposition of an additional tax on the undistributed earnings of a banking institution would have been equivalent to flying in the face of the settled policy of banking authorities requiring the establishment of reserves, out of the bulk of earnings, for the safety and protection of the depositing public. Hence, though a particular institution falls without the definition of a "bank" as drafted by a state legislature, this same institution may well fall within the clear policy and broad definition stated by Congress.

■ All of the business of petitioner consists of receiving deposits, specifically termed "investments", and of making loans and discounts. Interest is paid on the deposits at a rate fixed by its Board of Directors. A legal rate of interest is charged in advance upon the entire amount of the loans made. It is true that checks drawn on accounts in other institutions are not accepted as deposits, or so-called "certificates of investments", and that petitioner has no authority to accept deposits subject to check. But money is withdrawn by depositors through the use of check-like forms furnished by petitioner. And though petitioner has a regulation which states that "checks" are not to be drawn payable to persons other than the petitioner, petitioner, where this regulation is violated, does honor such checks when they are presented by endorsees at petitioner's place of business. There is no dispute over the fact that petitioner is subject by the law of the State of Virginia to supervision and examination by the very same authority which supervises within the State all commercial and other banking institutions, i. e., by the Banking Department of the Corporation Commission of Virginia.

The sum total of petitioner's business activities indicates that petitioner comes within the classification set out in section 104 of a "bank", and within the general meaning of that term. Bouvier's Law Dictionary (Baldwin's Students' Ed., 1934) states: "A 'bank' is an institution of a quasi public character. It is chartered by the government for the purpose inter alia of holding and safely keeping the moneys of individuals and corporations. * * * In commercial law. A place for the deposit of money. An institution, generally incorporated, authorized to receive deposits of money, to lend money, and to issue promissory notes, usually known by the name of bank notes,—or to perform one or more of these functions." In Ballentine's Law Dictionary (1930), we find the following definition of a bank: "A business institution the principal functions of which are to receive deposits of money, to discount notes, to purchase bills of exchange, and to issue its own notes payable on demand to bearer." Funk & Wagnall's New Standard Dictionary (1937 Ed.) defines a "bank" as: "An institution for lending, borrowing, issuing or caring for money." And Black's Law Dictionary (3d Ed. 1933) contains the following definition: "An institution of great value in the commercial world, empowered to receive deposits of money, to make loans, and to issue its promissory notes, * * * or to perform any one or more of these functions."

■ A reading of these general definitions clearly reveals that the chief functions of a bank involve. (1) the receipt

of deposits from the general public, repayable to the depositors on demand or at a fixed time, (2) the use of deposit funds for secured loans, and (3) the relationship of debtor and creditor between the bank and the depositor. These seem to be the bare requisites; for, certainly, an institution may still be given the general classification of a "bank" despite many other extensive and varied activities. Indeed, the title "bank" will vary with differences in the purpose of classification. The wide range in the definition of this word becomes apparent when we note that there are national banks and state banks; that there are savings-banks, private banks, and loan and trust companies; that there are Federal Reserve Banks, Federal Home Loan Banks, Banks for Cooperatives, Federal Intermediate Credit Banks, and Federal Land Banks. In Oulton v. German Savings & L. Soc. 1872, 84 U.S. 109, 118, 119, 17 Wall. 109, 118, 119, 21 L.Ed. 618, Mr. Justice Clifford enunciated a definition of banks which has now become classic: "Banks in the commercial sense are of three kinds, to wit: 1, of deposit; 2, of discount; 3, of circulation. Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution. Originally the business of banking consisted only in receiving deposits, such as bullion, plate, and the like, for safe-keeping until the depositor should see fit to draw it out for use, but the business, in the progress of events, was extended, and bankers assumed to discount bills and notes and to loan money upon mortgage, pawn, or other security, and at a still later period to issue notes of their own intended as a circulating currency and a medium of exchange instead of gold and silver. Modern bankers frequently exercise any two or even all three of those functions, but it is still true that an institution prohibited from exercising any more than one of those functions is a bank in the strictest commercial sense * * *."

A long line of authorities indicates the liberal attitude of both federal and state courts in classifying as a "bank" institutions which both receive deposits and negotiate secured loans. Cf. Smith v. Kansas City Title & Trust Co., 1921, 255 U.S. 180, 210, 41 S.Ct. 243, 65 L.Ed. 577; Auten v. United States National Bank, 1899, 174 U. S. 125, 142, 19 S.Ct. 628, 43 L.Ed. 920; Warren v. Shook, 1875, 91 U.S. 704, 710, 23 L.Ed. 421; Kansas v. Hayes, 10 Cir. 1932, 62 F.2d 597, 600; In re Prudence Co.,

Inc., D.C.E.D.N.Y., 10 F.Supp. 33, 36. Also, see State Tax Commission v. Yavapai County Sav. Bank, 1938, 52 Ariz. 374, 81 P. 2d 86, 88, 90; Dunn v. State, 1913, 13 Ga. App. 314, 79 S.E. 170, 172.

A "bank" is defined in section 104(a) as "a bank or trust company * * * doing business under the laws of the United States * * *, of any State, or of any. Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks * * *, and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions." We are of the opinion that the activities of petitioner bring it within the express terms of this statute, as well as within the commonly understood definition of a "bank". We are of the further opinion that the Board erred in concluding that the peculiarities of state laws were determinative of the instant issue.

■ This Court has often observed that taxation is concerned with realities and that, in considering tax matters, we are controlled by matters of substance and not of form. Cf. Dodge Brothers v. United States, 4 Cir., 118 F.2d 95, 102, 103 (C.C.A. 4th, 1941). Also, Weiss v. Stearn, 1924, 265 U.S. 242, 254, 44 S.Ct. 490, 68 L.Ed. 1001, 33 A.L.R. 520. By looking at the substance of petitioner's business transactions, we have been immediately led to the instant conclusion. We cannot accept the proposition that a special classification given by state law can so act as to withdraw an institution, which possesses the essential characteristics of a bank, from the protection afforded by the wording of, and the policy underlying, section 104. Furthermore, we are mindful that, wherever possible, federal taxing statutes are to be uniformly interpreted. Cf. Burnet v. Harmel, 1932, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L. Ed. 199; Thomas v. Perkins, 1937, 301 U.S. 655, 659, 57 S.Ct. 911, 81 L.Ed. 1324; Lyeth v. Hoey, 1938, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410. Also, cf. New York v. Feiring, May 26, 1941, 61 S.Ct. 1028, 85 L.Ed. ——; Commissioner v. Greene, 9 Cir., April 21, 1941, 119 F.2d 383. As Mr. Justice Stone recently stated in United States v. Pelzer, March 3, 1941, 61 S.Ct. 659, 661, 85 L.Ed. ——: "But as we have often had occasion to point out, the revenue laws are to be construed in the

light of their general purpose to establish a nationwide scheme of taxation uniform in its application. Hence their provisions are not to be taken as subject to state control or limitation unless the language or necessary implication of the section involved makes its application dependent on state law."

We believe that the implication of section 104 does not make "its application dependent on state law", and that our present conclusion is in accord with the views expressed above by Mr. Justice Stone. Any other conclusion might lead to results so weird that, under the argument ab inconvenienti, we cannot believe Congress intended these strange and contradictory results. The interpretation placed by the Board on section 104 might well result in levying this tax on substantially similar financial institutions in half of the States of the United States and in relieving from the tax these institutions in the other half of the States. We cannot lend our approval to an interpretation of a federal taxing statute which brings such things to pass.

For the foregoing reasons, the decision of the Board is reversed.

Reversed.