**INDIANAPOLIS MORRIS PLAN CORPORATION**

v.

**The UNITED STATES.**

No. 453–77.

United States Claims Court.

Sept. 16, 1983.

William A. Cromartie, Chicago, Ill., for plaintiff. John L. Snyder, Chicago, Ill., and Francis O. McDermott, Washington, D.C., of counsel.

Theodore D. Peyser, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

YOCK, Judge.

This case involves a claim for a refund of the excess profits tax paid by Indianapolis Morris Plan Corporation in the taxable year 1953. On a stipulation of facts, the plaintiff has moved for summary judgment contending that funds received in return for certificates of investment issued by the plaintiff should be considered "borrowed capital" as defined by section 439(b)(1) of the Internal Revenue Code of 1939, and therefore included in the calculation of the excess profits tax credit, which offsets the amount of excess profits tax due. On cross-motion for summary judgment, the defendant contends that such funds received by the plaintiff are not "borrowed capital" within the scope of section 439(b)(1). For reasons set forth below, the plaintiff's motion for summary judgment is granted, and the defendant's cross-motion for summary judgment is denied.

### Facts

The pertinent facts were stipulated by the parties or otherwise included in nondisputed affidavits in this claim for refund of excess profits tax and are hereinafter set forth.

During 1953, the taxable year in issue, the plaintiff Indianapolis Morris Plan Corporation (IMPC) was an industrial loan and investment company with its principal place of business at 110 East Washington Street, Indianapolis, Indiana. The plaintiff was organized under the authority of the Indiana Industrial Loan and Investment Act, Ind. Code Ann. §§ 18–3101 to –3125 (Burns 1950), now codified as §§ 28–5–1–1 to –24 of the Indiana Code.

As an industrial loan and investment company, IMPC received funds from the general public through the issuance of investment certificates. It then generally used such funds to make short-term consumer loans. It made no commercial loans nor loans secured by mortgages on real property. IMPC issued to the public three kinds of certificates of indebtedness or investment, consisting of Fully Paid Investment Certificates, Installment Investment Certificates, and Christmas Savings Club Certificates. Plaintiff's investment certificates constituted "certificates of indebtedness or investment" as referred to and authorized by Ind.Code Ann. § 18–3112 (Burns 1950).

The plaintiff's Fully Paid Investment Certificates had a maturity date of six months from the date of issue and required a minimum investment of $500 or $1000. Certificates in excess of the minimum investment were issued only in multiples of $100. Plaintiff offered two types of interest plans with the Fully Paid Investment Certificates; interest was either mailed every six months or accumulated and compounded twice each year. If a certificate was redeemed prior to maturity, plaintiff paid no interest. If the certificate was not presented for payment at the date of maturity, it was automatically renewed for an additional six months. If, however, the certificate was redeemed after six months, but before the renewed maturity date, the customer would lose only the interest accrued during the second term of the certificate.

The Plaintiff's Installment Investment Certificates required no minimum investment, had no maturity date, and was evidenced by a savings passbook. Customers wishing to deposit funds to their account would present their passbook to the cashier, who would record the transaction in the passbook reflecting the increased balance, and return it to the customer. Similarly, if customers desired to withdraw funds from their account, they would present the passbook with a completed withdrawal slip to the cashier, who would record the transaction by reducing the balance in the passbook, deliver the cash, and return the passbook. Interest on the Installment Investment Certificates was compounded and credited to an account twice each year. In general, interest was computed on the average beginning-of-the-month balances, reduced by withdrawals. Customers could, at their option, deposit or withdraw funds in any amount from their passbook account; withdrawals, of course, being limited to the balance of the account. The owner of an Installment Investment Certificate also had the opportunity to convert that certificate, assuming sufficient funds existed in the passbook account, to a Fully Paid Investment Certificate.

In addition to the Fully Paid and Installment Certificates, plaintiff offered its customers a Christmas Savings Club Certificate. This certificate enabled a customer to save for 10 or 11 months, at about five percent interest, and receive a check from plaintiff in early December for the principal and interest earned. Customers elected how much they intended to save and, based on that figure, made equal contributions to their account every two weeks. Premature withdrawals from the account, either partial or total, were not permitted and resulted in the forfeiture of all interest, plus assessment of a 50 cent service charge.

IMPC paid interest rates that were generally somewhat higher than those paid by state or federally chartered commercial banks in Indianapolis. In 1953, IMPC paid two percent on Installment Certificates of Investment and three percent on Fully Paid Investment Certificates. Commercial banks paid one percent on passbook savings.

Savings and loan institutions paid two and one-half percent on savings accounts.

When a person wanted to acquire one of the certificates offered by IMPC, they would be directed to an employee in the savings department, where an individual, usually designated as a "savings officer," would explain the provisions of the arrangement, request that a signature card be signed, request payment for the certificate, and deliver to the customer various documents evidencing the transaction.

Pursuant to the terms of the Fully Paid and Installment Investment Certificates, plaintiff reserved the right to redeem those certificates upon 30 days' written notice to the owner. IMPC also had the right to require 90 days' notice by the owner in order for the owner to redeem the certificates, although the plaintiff never exercised this right. When notice was given, fully paid certificates and installment certificates were redeemed with interest only through the last prior date on which interest was credited or paid. If 30 days' notice was given, installment certificates were paid with interest through the date of withdrawal. In addition, pursuant to state statute, IMPC could limit the amount of its redemption payments in a given month to the amount of the prior month's net receipts. The plaintiff never exercised this protective right.

IMPC also offered its customers certain additional financial services. It issued its own money orders, sold travelers checks for a national bank, and processed sales of United States Savings Bonds. Plaintiff also offered its customers a "Shoppers Charge Service" that allowed customers to make purchases on credit from local Indianapolis retailers in a manner similar to that now used by holders of the present day Master Charge card. During 1953, all "Shoppers Charge Service" accounts were payable in full in 60 days. Such charge services were not then available to consumers in the Indianapolis area from other financial institutions. Plaintiff did not issue certified checks, issue letters of credit, accept deposits payable on demand or payable on order to third parties, accept commercial accounts, receive money for transmission to foreign countries, or offer the services of a trust department.

The plaintiff was regulated by the Small Loans and Consumer Credit Division of the Indiana Department of Financial Institutions. The same Indiana Department of Financial Institutions also regulated traditional banks chartered by the State of Indiana through its Division of Banks and Trust Companies. Banks chartered as such by the State of Indiana were authorized to do business and operated under the Indiana Financial Institutions Act, Ind.Code Ann. § 18–101 et seq. (Burns 1950).

Plaintiff was required to obtain state approval of its various investment certificates prior to offering them to the public and also needed state consent prior to altering the interest rate or the terms of its certificates. Plaintiff was required by section 18–3113 of the Indiana Industrial Loan and Investment Act to maintain a cash reserve in Indiana banks equal to at least five percent of its outstanding certificates and was subject to annual surprise audits by the Department of Financial Institutions.

The plaintiff's main competitors for funds from the general public were savings banks, savings and loan institutions, credit unions and life insurance companies. Plaintiff's main competitors in extending loans were personal loan and finance companies.

During 1953, IMPC was "one of America's Largest Personal Loan and Savings Institutions." Savings and loan institutions in Indiana made first mortgage real estate loans, whereas IMPC, although authorized to make real estate loans, did not do so, preferring shorter term loans. IMPC used advertising slogans such as "Safety for Savings for Well Over a Quarter Century." Such slogans were intended by IMPC to assure present and prospective customers that they would not lose money turned over to IMPC. Persons acquiring IMPC's certificates were motivated and largely influenced by the desire and purpose of obtaining a high rate of return and a relatively safe place for their money.

During 1953, IMPC was a member of the Morris Plan Bankers Association and the American Industrial Bankers Association. It was not eligible for membership in the Federal Reserve System, nor were its investment certificates eligible for insurance coverage by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation.

IMPC timely filed its 1953 federal income and excess profits tax return with the Internal Revenue Service. On its return, IMPC reported excess profits net income of $807,655.24 and an excess profits credit of $1,703,473.66. In calculating this excess profits tax credit, IMPC included the amounts received for its investment certificates in borrowed capital. Accordingly, it reported no excess profits tax due for that year. By statutory notice of deficiency, the Commissioner of Internal Revenue determined, *inter alia,* that IMPC was a bank for the purpose of the Excess Profits Tax Act of 1950, and that its investment certificates, as such, did not constitute borrowed capital. Accordingly, it adjusted the plaintiff's excess profits net income, reduced the excess profits tax credit to $233,115.83 and asserted a deficiency against the plaintiff of $113,614. The plaintiff paid the asserted deficiency, plus assessed interest of $36,105.90 and timely filed a claim for refund. The defendant concedes that plaintiff properly instituted suit in the Court of Claims on September 13, 1977.

## Discussion

The Excess Profits Tax Act of 1950, 64 Stat. 1137, 26 U.S.C. §§ 430–474 (1952), was enacted on January 3, 1951, and was effective for tax years ending after June 30, 1950, through December 31, 1953. The purpose of the Act was to impose a tax on that portion of a corporate taxpayer's income that was expected to be higher due to the larger military budget resulting from the wartime conditions imposed by the Korean War.[1] A similar excess profits tax had been imposed during World War II.[2]

The Act measured excess profits by the taxpayer's excess profit net income (as defined by section 433(a) of the Excess Profits Tax Act of 1950) less the excess profits tax credit. The credit was the greater of: (a) a credit computed on average earnings in a base period, or (b) a credit based on return on invested capital. I.R.C. §§ 435–436 (1952). This case involves a credit based on return on invested capital.

The mechanics of calculating the excess profits tax credit was to take the amount of equity capital (total assets minus total liabilities), and add 75 percent of the average daily amount of borrowed capital. This figure was then multiplied by 12 percent to arrive at the amount of the excess profits tax credit. Thus, the amount of borrowed capital had a direct effect on the size of the credit.

The terms "borrowed capital," "certificate of indebtedness," and "bank," as defined by the Excess Profits Tax Act of 1950, are of primary importance in the resolution of this case.

Section 439(b)(1) of the Internal Revenue Code of 1939 defined "borrowed capital" as:

> The amount of the outstanding indebtedness * * * of the taxpayer, incurred in good faith for the purposes of the business, which is evidenced by a bond, note, bill of exchange, debenture, *certificate of indebtedness,* mortgage, deed of trust, bank loan agreement, or conditional sales contract. [Emphasis added.]

Treasury Regulation § 40.439–1(f) (Supp. 1952) was promulgated to interpret "certificate of indebtedness" in the above code section:

> The term "certificate of indebtedness" includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between indi-

---

1. *Ladish Co. v. United States,* 301 F.2d 257 (7th Cir.1962); S.Rep. No. 2679, 81st Cong., 2d Sess., 1951–1 C.B. 240.

2. Excess Profits Tax Act of 1940, 54 Stat. 974 (1940).

viduals. * * * Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check, and the term "bank loan agreement" does not include the indebtedness of a bank to a depositor.

Section 104 of the Internal Revenue Code of 1939 defined "bank" as:

[A] bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any State, or of any Territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts, or of exercising fiduciary powers similar to those permitted to national banks * * and which is subject by law to supervision and examination by State, Territorial or Federal authority having supervision over banking institutions. * * *

The defendant contends that the plaintiff's investment certificates did not constitute "borrowed capital" within the purview of section 439(b)(1). The defendant submits that IMPC was a bank, as defined by section 104, and that IMPC's investment certificates thus represented deposits in a bank.

The plaintiff, on the other hand, contends that the funds received from selling its investment certificates were properly included as "borrowed capital" in the determination of the excess profits tax credit for 1953. The plaintiff submits that it was not a bank, and that its investment certificates were not bank deposits, but were more in the nature of investment securities.

The issues presented by the case are not easily resolved. There are well-reasoned precedents in support of both the plaintiff's position and the defendant's position. This Court, however, holds that after careful review of the relevant case law (set forth below) as applied to the facts of this case, that the plaintiff has the better of the argument and should prevail in this tax refund action.

The earliest decision in this area was in *Staunton Industrial Loan Corp. v. Commissioner,* 120 F.2d 930 (4th Cir.1941). In *Staunton Industrial Loan,* the Fourth Circuit held that the Virginia industrial loan corporation was a bank under section 104 of the Internal Revenue Code of 1939. The Commissioner had argued that the taxpayer could not be considered a bank for purposes of section 104. *See also Mutual Savings and Loan Company of Norfolk,* 44 B.T.A. 1204 (1941). The taxpayer in *Staunton Industrial Loan* accepted funds from the public for deposit in passbook savings accounts, Christmas club accounts, and in exchange for "certificates of investment." The taxpayer's business consisted of "receiving investments and making loans and discounts." 120 F.2d at 931. The taxpayer, unlike IMPC, was liable on its certificates of investment and other accounts to their full amount regardless of current (past month) receipts. Moreover, the taxpayer in *Staunton Industrial Loan,* unlike IMPC, was eligible for membership in the Federal Reserve System.

The Fourth Circuit held that although the laws of Virginia make a distinction between banks and industrial loan associations, "we do not believe that the peculiarities in individual state laws are controlling * * * in the interpretation of section 104." *Id.* at 933. The court looked at the business activities of the taxpayer and concluded that the taxpayer was a bank, and therefore that the investment certificates represented deposits.

In the next case in this area, *Morris Plan Bank of New Haven v. Smith,* 125 F.2d 440 (2d Cir.1942), the Commissioner again argued that the taxpayer was not a bank under section 104 of the Code. The Second Circuit, however, held that the taxpayer was a bank within the meaning of section 104. The taxpayer was organized under the laws of Connecticut and classified as an "industrial bank." The taxpayer's business consisted of making loans and discounts, and issuing installment-type certificates of indebtedness. The certificate owners could withdraw what they had paid in at any time, subject to some restrictions, including 30 days' notice. There was no indication,

however, that the taxpayer's obligation on its certificates was other than absolute and unrelated to its past months' receipts.

The Second Circuit, like the Fourth Circuit in *Staunton Industrial Loan,* rejected the state law characterization of the taxpayer, and held that the taxpayer was a bank for federal tax purposes. 125 F.2d at 442. Moreover, the Court held that the certificates of indebtedness represented deposits:

> The [taxpayer] took these payments under agreements which made them part of its general funds and created only the relationship of debtor and creditor between it and the payer. It issued the certificates of indebtedness in form similar to that of deposit books used by savings banks. Payments and withdrawals were entered in them and these accounts were active.

*Id.* at 441.

Neither of the above two cases, however, was interpreting the World War II Excess Profits Tax Act. They both were concerned about whether or not the industrial loan companies involved were similar enough to traditional banks to be taxed at a special low rate for banks versus a higher rate (involving a surtax) for corporations other than banks. The Courts in both cases decided that the industrial loan companies were similar enough to banks to be given the lower tax treatment.

In the first case to involve the "bank" and "deposit vs. investment" issues within the context of a wartime excess profits tax scheme, the Tax Court held that "certificates of deposit" issued by the taxpayer, a savings and loan company, represented moneys properly allowable in computing the taxpayer's borrowed capital for excess profits tax purposes (*i.e.,* they were security investments as opposed to deposits in a bank). *Economy Savings & Loan Co. v. Commissioner,* 5 T.C. 543 (1945), *modified on other issues,* 158 F.2d 472 (6th Cir.1946). The taxpayer in *Economy Savings & Loan* was a savings and loan association organized under the laws of Ohio, and engaged in the business of making chattel loans. Pur-

suant to its bylaws, the taxpayers accepted funds from the general public and issued "certificates of deposit," in stated amounts. The Commissioner argued that the taxpayer was engaged in the banking business. Moreover, the Commissioner argued that the certificates issued by the taxpayer represented bank deposits and were not instruments having the general character of investment securities.

The Tax Court first addressed the issue of whether the certificates had the general character of investment securities:

> Are the funds deposited with petitioner [in exchange for the certificates] invested in petitioner's business? Does this certificate have the general character of investment securities? We think these questions must be answered in the affirmative. The money so advanced to petitioner was used in its business for the making of chattel loans. There is no question here * * * that the money so received had no business purpose or that the transactions were not bona fide in every respect. The certificate states upon its face that it is not subject to check. It is not negotiable. There are definite limitations on the right of the depositor to withdraw the funds deposited pursuant to its terms.
>
> *      *      *      *      *      *
>
> We * * * hold that the certificate of deposit issued by petitioner is a certificate of indebtedness, an instrument having the general character of an investment security * * *. It follows that the moneys secured by these certificates were properly includible in computing petitioner's capital for the purposes of excess profits tax credit.

*Id.* at 550–52 (citation omitted).

Having determined that the certificates issued by the taxpayer were not deposits, the Tax Court decided not to address the "bank" issue: "We do not pass on the question of whether or not petitioner is in the banking business. We think that is immaterial to the precise question presented." *Id.* at 552.

The Commissioner of Internal Revenue acquiesced in the decision in *Economy Savings & Loan.* 1945 C.B. 3. In 1959, six years after the taxable year in issue (1953), the Commissioner withdrew his acquiescence. 1959–1 C.B. 6. While the Commissioner may in some situations retroactively revoke his acquiescence, 9 Mertens, *Law of Federal Income Taxation,* § 50.94, at 295 n. 3 (1982), such action would be inappropriate when, as here, Congress incorporated the provisions of the World War II excess profits tax (under consideration in *Economy Savings & Loan* ) into the Excess Profits Tax Act of 1950. *Cf. United States v. Ryan,* 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931).

*Economy Savings & Loan,* with the Commissioner's acquiescence, was the law when the Excess Profits Tax Act of 1950 was passed. Nothing in the Act's legislative history indicates that Congress disapproved of the result in *Economy Savings & Loan.* Despite the Commissioner's acquiescence in *Economy* and the subsequent reenactment of identical statutory language, the IRS took the position in other cases that, under the 1950 Act, certificates sold to the public by financial institutions other than commercial banks were not properly includible in borrowed capital.

This change in position apparently was the result of the Eighth Circuit's decision in *Commissioner v. Ames Trust & Savings Bank,* 185 F.2d 47 (8th Cir.1950), *rev'g,* 12 T.C. 770 (1949). In *Ames Trust,* the Tax Court extended the reasoning of *Economy Savings & Loan* to include the time deposits of commercial banks in "borrowed capital," even though the plaintiff in *Ames Trust* was concededly a bank. The Tax Court's decision was reversed by the Eighth Circuit shortly before the 1950 Act was passed by Congress. The Tax Court followed the Eighth Circuit's decision in *Ames Trust* in later cases involving the time deposits of commercial banks. *E.g., La Salle National Bank,* 23 T.C. 479 (1954); *Southern Bank of Norfolk,* 11 Tax Ct.Mem.Dec. (CCH) 47 (1952); *National Bank of Commerce,* 16 T.C. 769 (1951); *Capital National Bank of Sacramento,* 16 T.C. 1202 (1951). These cases clearly indicate that limitations on the ability to receive payment involving only notice or the passage of time may not change the legal relationship between a commercial bank and its depositors. *Ames Trust* and its progeny, however, do not vitiate in any way the authority of *Economy Savings & Loan* as applied to industrial loan companies. *Jackson Finance & Thrift Co. v. Commissioner,* 260 F.2d 578, 581 (10th Cir.1958); *see United States v. City Loan and Savings Co.,* 287 F.2d 612, 615 (6th Cir.1961); *see also Commissioner v. Ames Trust & Savings Bank,* 185 F.2d 47, 50 (8th Cir.1950).

In the first case to consider the "bank" and "certificates of deposit" issue within the context of the Excess Profits Tax Act of 1950, the Tenth Circuit rejected the Commissioner's *Ames Trust* position. *Jackson Finance & Thrift Co. v. Commissioner,* 260 F.2d 578 (10th Cir.1958). The main issue in *Jackson Finance* was whether moneys received by an industrial loan corporation through the issuance of "thrift certificates" constituted borrowed capital for purposes of the excess profits tax credit. The Tax Court, relying upon the authority of *Commissioner v. Ames Trust & Savings Bank,* 185 F.2d 47 (8th Cir.1950), held that the thrift certificates represented deposits and not borrowed capital.

However, the Tenth Circuit reversed the Tax Court and rejected its reliance upon *Ames Trust:*

> Both the decision of the Tax Court in the instant case and the position of the Commissioner on present appeal recognize a direct reversal of the earlier position taken by each in [*Economy Savings & Loan* ] and rely upon the authority of [*Ames Trust* ] * * *. We can see no such compulsion in the rationale of Ames and most certainly not in its express words * * *. Just as the distinction between deposit liability of banks and the commercial indebtedness of loan companies was recognized in Economy it was further held determinative in Ames.

260 F.2d at 581.

The Tenth Circuit relied heavily upon the presumption that in adopting the 1950 Act

in a form virtually unchanged from the 1940 Act, Congress intended to adopt the judicial construction of *Economy Savings & Loan* and the Commissioner's administrative acquiescence:

At the time that Congress enacted the Excess Profits Tax Act of 1950 it failed to amend, revise or in any way alter the definition of borrowed capital as it was contained in the earlier World War II Act except to add transactions evidenced by conditional sales contracts and bank loan agreements. At such time the judicial interpretation of the Tax Court in Economy, the administrative interpretation of the Treasury Department through regulation, and the formal acquiescence of the Commissioner in the holding of Economy were all part and parcel of the actual and effective administration of the earlier tax statute. The distinction between the deposit liability of a bank and the nature of a borrowing transaction such as we here consider had, in 1950, been recognized both judicially and administratively. By reenacting the statutory definition of borrowed capital for purposes identical with that definition's original purpose it must be presumed that Congress both approved and intended to adopt the judicial and administrative interpretation and construction that had been placed upon its words by those responsible for statutory interpretation and administration.

*Id.*

■ This Court finds the reasoning of the Tenth Circuit to be persuasive. Moneys received by an industrial loan corporation in exchange for certificates are not deposits. Such funds do constitute borrowed capital for purposes of the Excess Profits Tax Act of 1950.

In *United States v. City Loan and Savings Co.,* 287 F.2d 612 (6th Cir.1961), *aff'g* 177 F.Supp. 843 (N.D.Ohio 1959), the Sixth Circuit also agreed with the rationale of the Tenth Circuit in *Jackson Finance.* Relying on *Economy Savings & Loan* and *Jackson Finance,* the Sixth Circuit held that certificates of deposit issued by an Ohio building and loan corporation constituted borrowed capital. The court distinguished *Economy Savings & Loan* from *Ames Trust* on the ground that the petitioner in *Economy Savings & Loan* was not a bank and that Ames Trust was a bank. Having determined that the certificates constituted borrowed capital and that the taxpayer was not a bank, the court in *City Loan and Savings* concluded: "While the question in this case is a close one, we think that the administrative practice of the Commissioner in following Economy for so many years is not to be lightly discarded." 287 F.2d at 616.

*Economy Savings & Loan, Jackson Finance,* and *City Loan and Savings,* remained the law throughout the 1950's and for almost a decade after the excess profits tax was no longer in effect. In 1962, however, the Ninth Circuit in *Commissioner v. Valley Morris Plan,* 305 F.2d 610 (9th Cir.) (reversing 33 T.C. 572 (1959)), *cert. denied,* 371 U.S. 925 (1962), and *Commissioner v. Morris Plan Co. of California,* 305 F.2d 610 (9th Cir.) (reversing 33 T.C. 720 (1960)), *cert. denied,* 371 U.S. 925, 83 S.Ct. 293, 9 L.Ed.2d 231 (1962), concluded that these established precedents were wrongly decided. This Court, however, is of the opinion that the Ninth Circuit's opinion was wrongly decided.[3]

In *Valley Morris Plan,* the taxpayer was a California industrial loan corporation, and issued, subject to regulation, term thrift certificates (similar to the Fully Paid Investment Certificates in issue here). The certificates had maturity dates six months after issue, with provisions for automatic renewal, bore interest, and allowed the taxpayer to limit the aggregate amount of redemption in any one calendar month to its net receipts for the previous calendar month. The money obtained by the taxpayer on the issuance of the certificates was

---

3. This Court agrees with the *Valley Morris* case in one respect, however, that is that no valid distinction exists between fully paid certificates and installment certificates as to whether such certificates should be included in borrowed capital or not. *See Valley Morris,* 305 F.2d at 627.

used in its business of making loans and purchasing paper, notes, conditional sales contracts, and other evidence of indebtedness. The only other money available for the taxpayer's business was capital and money borrowed from banks. The state regulations and restrictions on the taxpayer were substantially different from the state regulations concerning banks.

The Tax Court, addressing the issue of whether the amount of the outstanding term thrift certificate constituted borrowed capital, determined that:

> The petitioner was not a bank and was prohibited by law from receiving deposits. Its term thrift certificates were not certificates of deposit * * *. The certificates were not "instruments evidencing debts arising in ordinary transactions between individuals" but were distinguishable from such instruments in much the same ways as are "instruments having the general character of investment securities issued by a corporation."

33 T.C. at 579.

The Tax Court reviewed *Economy Savings & Loan, Jackson Finance,* and *Ames Trust* and concluded: "None of the cited cases reviewed above is precisely in point here although, of course, if this Court was correct in the *Economy* case in allowing certificates of deposit to be included in borrowed capital, then surely the term thrift certificates involved herein * * * would be borrowed capital * * *." *Id.* at 581.

The Tax Court held: "The answer is not free from doubt, but the Court concludes that the petitioner is entitled to include in the computation of the invested capital credit, the indebtedness evidenced by its term thrift certificates." *Id.*

In *Morris Plan Company of California v. Commissioner,* the taxpayer was likewise a California industrial loan corporation. The case involved installment thrift certificates (similar to the plaintiff's installment investment certificates). The installment thrift certificates were evidenced by a passbook, had no maturity, bore interest, required no minimum investment, and provided that the corporation could limit the aggregate with-

drawals in any one month to the net receipts of the preceding calendar month. The Tax Court found several differences between the installment thrift certificates and regular bank passbook savings accounts. 33 T.C. at 723.

As in *Valley Morris Plan,* the issue was whether the indebtedness evidenced by the certificates should be included in borrowed capital for purposes of the excess profits tax credit. The Tax Court determined that the installment thrift certificates were instruments having the general character of investment securities issued by a corporation:

> The petitioner obtained by far the largest part of its working capital from the sale of these certificates. It seems fair to conclude from the entire record that they represented investments by the holders of the certificates. They were similar in many respects to the types of evidences of indebtedness listed in section 439(b)(1). It is difficult to exclude these certificates from borrowed capital under that section even under the Commissioner's regulations, despite their lack of a maturity date.

33 T.C. at 727. The Tax Court, relying primarily upon *Jackson Finance,* held that "all of the indebtedness evidenced by the certificates issued by the present petitioner, should be included in the computation of the invested capital credit under section 439(b)(1)." *Id.* at 728.

*Valley Morris Plan* and *Morris Plan Company of California* were both reversed on appeal. 305 F.2d 610. The Ninth Circuit held that the taxpayers were banks and that their certificates were deposits. The court looked to the subjective intent of the holders of the certificates as the determinative criterion in classifying the funds received in exchange for the certificates:

> There is no testimony in the record from any of the purchasers of Term Thrift Certificates as to an intention to make a loan for the purposes of the business to respondent and we have failed to find any other testimony or evidence of such an intention. The certificates them-

selves * * * disclose no purpose or intent of the purchasers to make a loan at the request of respondent for purposes of respondent's business.

*Id.* at 617. The Ninth Circuit found that the certificate holders were motivated by a desire for safekeeping their money, a desire similar to that of depositors in banks. Thus, the Court concluded that the certificate represented deposits and not investments or borrowed capital.

The Ninth Circuit then addressed the issue of whether the taxpayers were banks for purposes of the Excess Profit Tax Act of 1950. Relying on *Staunton Industrial Loan Corp.* and *Morris Plan Bank of New Haven,* and rejecting *Jackson Finance,* the Ninth Circuit determined that the taxpayers were banks:

> [T]he transaction involving the purchase of a thrift certificate issued by the Morris Plan Company of California, and the withdrawal of a portion or all of the money paid for such certificate is similar to and almost identical with the procedure involved in deposits in a bank.

305 F.2d at 623.

The final judicial word on this area of the law came in *Morris Plan Company of California v. United States,* [1968] Fed.Taxes (P–H) ¶ 58,050. In a recommended decision never finalized by the U.S. Court of Claims, Commissioner Evans of the Court of Claims, relying on a then-recent Supreme Court decision, *Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), concluded that the certificates of the Morris Plan Company of California were properly included in the computation of that taxpayer's borrowed capital without regard to the subjective intent of the purchasers of its certificates:

> The Supreme Court decision in *Tcherepnin v. Knight* destroys the relevance in the instant case of the distinction between intention to invest and "the desire and purpose of obtaining a place of safekeeping for * * * money," upon which the [Ninth and Tenth Circuits] divided. The purchaser of shares in a savings and loan association may well be motivated by both purposes. So, indeed, may the purchaser of thrift certificates issued by an industrial loan company. The similarity of industrial loan thrift certificates to savings and loan shares invites application of the reasoning of *Tcherepnin v. Knight* to the instant case, with the resultant holding that the thrift certificates are in law corporate securities.

*Id.* at 58,035.

In sum total, then, this Court finds that the case law supporting the plaintiff's position is more persuasive than the case law supporting the defendant. The two earliest decisions cited by the parties, *Staunton Industrial Loan* and *Morris Plan Bank of New Haven* support the defendant's position. Neither of those decisions, however, involved the excess profits tax at issue here. The taxpayers in both of those cases were held to be banks, unlike the taxpayer in this case and the taxpayers in the other excess profits tax cases cited as to make those two decisions inapposite here.

The first three excess profits tax cases involving the issues before this Court all support the plaintiff's position. *Economy Savings & Loan,* involving the World War II Excess Profits Tax and *Jackson Finance* and *City Loan and Savings,* involving the Korean War Excess Profits Tax, all held that investment certificates issued by savings and loan and industrial loan companies represented borrowed capital and not deposits.

In addition to those three decisions, plaintiff's position is supported by the longstanding acquiescence of the Commissioner in the holding of *Economy Savings & Loan.* That acquiescence was in effect during the taxable year in issue. More importantly, *Economy Savings & Loan,* with the Commissioner's acquiescence, was the law when the Excess Profits Tax Act of 1950 was passed. Thus, Congress implicitly approved and adopted the *Economy Savings & Loan* interpretation of borrowed capital.[4]

---

4. *See* Discussion, this decision, at pp. 389, 390.

■ The only directly relevant decision supporting the defendant's position is the Ninth Circuit's *Valley Morris Plan.* In an opinion long on quotations and short on clear reasoning, the Ninth Circuit looked to the subjective motivations of the taxpayer's customers in determining the proper characterization of the taxpayer/institution and its certificates. In matters of tax law, courts generally avoid inquiries into subjective motivations. *See Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *see also Morris Plan Co. of California v. United States,* [1968] Fed.Taxes (P–H) ¶ 58,050. This Court sees no reason to go against this general principle of tax law in the instant case. *Valley Morris Plan* is an aberration in this area of the law. Nothing in *Valley Morris Plan* persuades this Court to follow the Ninth Circuit and reject the superior reasoning contained in *Economy Savings & Loan, Jackson Finance,* and *City Loan and Savings.*

■ This Court concludes that there are sufficient factual distinctions between the deposit liabilities of traditional banks and the investment liabilities of the plaintiff industrial loan and investment company to warrant differing tax treatment under the Excess Profits Tax Act of 1950. Without parading out all the factual distinctions enumerated earlier, it is noted that the plaintiff was not eligible for membership in the Federal Reserve System, nor were its investment certificates eligible for insurance coverage by the Federal Deposit Insurance Corporation. Likewise, state law specifically excluded the plaintiff from holding itself out to the public as a bank or engaging in the banking business. It was regulated by the Small Loan and Consumer Credit Division of the Indiana Department of Financial Institutions and not the Department's Division of Banks and Trusts. It paid much higher interest rates than banks did (in 1953). Unlike banks, plaintiff could not accept deposits payable on demand, or on order to third parties, accept commercial accounts, issue certified checks, issue letters of credit, receive money for transmission to foreign countries, or offer the services of a trust department. It competed with personal loan and finance companies for extending its loans, instead of banks. In gaining funds from the public, it competed more with savings and loan institutions than with banks. Finally, plaintiff could refuse to redeem any certificates at all beyond the amounts received in the prior month's receipts, thus limiting itself sharply from the demand liabilities of a bank.

Moreover, if Congress intended that all financial institutions be treated in the same way as traditional banks under the excess profits tax laws, it could have been far more specific about it. The regulations also could have been clearer. For all of the reasons discussed herein, this Court concludes that the plaintiff was not a bank within the definition of section 104 of the Code, and the certificates of investment at issue were closer to being investment securities than they were to being traditional bank deposits. Plaintiff was entitled to have its certificate of investment moneys included in borrowed capital for purposes of computing the excess profits tax credit.

## Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied.

Plaintiff is entitled to recover, together with interest according to law, with further proceedings to be had pursuant to Rule 42(c) as to the amount of recovery. Parties are allowed 60 days to stipulate to the amount of recovery or notify the Court as to the necessity for further proceedings.