153 T.C. No. 9

UNITED STATES TAX COURT

MONEYGRAM INTERNATIONAL, INC. AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket Nos. 12231-12, 30309-12.          Filed December 3, 2019.

P, a U.S. corporation, is in the "money services business." Its business involves the movement of money through three main channels: money transfers, money orders, and payment processing services, including "official check" services for financial institutions. During 2007 and 2008 P undertook a recapitalization that included writing down or writing off a substantial volume of partially or wholly worthless asset-backed securities. P claimed ordinary loss deductions on disposition of certain of these securities, a treatment available only to banks. See I.R.C. sec. 582(a). R disallowed the ordinary loss deductions on the ground that P did not qualify as a "bank."

---

[*]This Opinion supplements MoneyGram Int'l, Inc. & Subs. v. Commissioner, 114 T.C. 1 (2015), vacated and remanded, 664 F. App'x 386 (5th Cir. 2016).

To qualify as a "bank" under I.R.C. sec. 581, a taxpayer must meet three distinct requirements. First, it must be "a bank or trust company incorporated and doing business" under Federal or State law. Second, "a substantial part" of its business must "consist[] of receiving deposits and making loans and discounts." Third, it must be "subject by law to supervision and examination" by Federal or State authorities having supervision over banking institutions.

1. Held: P during 2007 and 2008 did not qualify as a "bank" within the meaning of I.R.C. sec. 581 because it did not display the essential characteristics of a bank as that term is commonly understood and because a substantial part of its business did not consist of receiving deposits and making loans and discounts.

2. Held, further, because P was not a "bank" within the meaning of I.R.C. sec. 581, it was ineligible to claim ordinary loss deductions on account of the worthlessness of its securities under I.R.C. sec. 582.

Henry T. Miller, James A. Bruton III, James T. Fuller III, Peter J. Anthony, Richard A. Husseini, Samara L. Kline, and Jacob L. Walley, for petitioner.

H. Barton Thomas, Jr., Teri L. Jackson, Randolph L. Hutter, and Reid M. Huey, for respondent.

SUPPLEMENTAL OPINION

LAUBER, Judge:  With respect to petitioner's Federal income tax for the taxable years 2005-2007 and 2009, the Internal Revenue Service (IRS or respondent) determined deficiencies in the following amounts:

| Year | Deficiency |
|------|------------|
| 2005 | $13,852,600 |
| 2006 | 25,471,993 |
| 2007 | 31,796,692 |
| 2009 | 11,644,589 |

In large part these deficiencies stem from the disallowance of bad debt deductions that petitioner claimed for 2007 and 2008 under section 166(a) with respect to "non-real-estate mortgage investment conduit" (non-REMIC) asset backed securities.[1]  Normally, losses realized upon the worthlessness of such securities are deductible as capital losses under section 165(g)(1) and (2)(C). Under section 582(a), however, petitioner was entitled to bad debt deductions on account of these losses--deductible in full against ordinary income--if it qualified as a "bank" within the meaning of section 581.

---

[1]All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar

In January 2015 this Court issued an Opinion holding that petitioner did not qualify as a "bank." MoneyGram Int'l, Inc. & Subs. v. Commissioner (MoneyGram I), 144 T.C. 1 (2015). In November 2016 the U.S. Court of Appeals for the Fifth Circuit vacated our decision and remanded the case with instructions that we reevaluate whether petitioner qualified as a "bank" by employing a definition that differs in two respects from the definition that we initially employed. MoneyGram Int'l, Inc. & Subs. v. Commissioner (MoneyGram II), 664 F. App'x 386 (2016). The Fifth Circuit also directed that we consider on remand whether a substantial part of petitioner's business consisted of "making * * * discounts," see sec. 581, a question that neither the parties nor we had previously addressed.

The parties have filed a second round of cross-motions for summary judgment on the question presented. Having adjusted our analysis as directed by the Fifth Circuit, we continue to be of the view that petitioner during 2007 and 2008 did not qualify as a "bank" within the meaning of section 581. For that reason petitioner was not entitled to deduct bad debt losses against its ordinary income on the write-down of its asset-backed securities. Accordingly, we will grant respondent's motion for summary judgment and deny petitioner's cross-motion.

Background

The following facts are derived from the parties' second stipulation of facts and attached exhibits. The parties' second stipulation of facts is considerably more comprehensive than their first stipulation of facts, which was before us in round one of these cases. The facts stated below thus differ in certain details from those stated in our previous Opinion.

MoneyGram International, Inc., is incorporated in Delaware and headquartered in Texas. It is the parent of a group of companies that operate a global payment services business. This business is conducted chiefly through MoneyGram Payment Systems, Inc. (MPSI), a wholly owned subsidiary incorporated in Delaware. We will refer to MoneyGram International, Inc., and its subsidiaries (including MPSI) as petitioner or MoneyGram.

I.     MoneyGram's Products and Services

MoneyGram has been in business since 1940. Its core purpose is to provide consumers and financial institutions with payment services that are affordable, reliable, and convenient. MoneyGram's business involves the movement of money through three main channels: money transfers, money orders, and payment processing services.

For financial reporting purposes MoneyGram divides its activities into two main segments: Global Funds Transfer and Payment Systems. Through its Global Funds Transfer segment, MoneyGram provides money transfer services and sells money orders to individual retail customers. Through its Payment Systems segment, MoneyGram provides payment processing services, including the processing of "official checks," for credit unions, community banks, and other financial institutions.

A.    Global Funds Transfer

1.    Money Transfers

MoneyGram sells money transfer services to consumers through agents, including supermarkets, convenience stores, and other retail locations. MoneyGram's agents range from well-known businesses such as Wal-Mart (during the years in issue), Albertson's, 7-Eleven Stores, and CVS Pharmacy to thousands of "mom and pop" groceries and corner stores.

A money transfer involves the transfer of funds from a consumer at one location to a consumer at a different location in the United States or abroad. In a typical money transfer, a consumer goes to the location of a MoneyGram agent, completes a form, and pays the agent the money to be transferred (plus a fee). This form explicitly states that the agent is not accepting a "deposit."

In a matter of minutes, the funds are made available for payment to the designated recipient, in various currencies, through MoneyGram's agent network. The fee paid by the consumer at the sending location is based on the amount to be transferred and the location at which the funds are to be received. The "sending" and "receiving" agents each receive commissions from MoneyGram on the transaction.

MoneyGram derives revenue from the transaction fees paid by consumers and from management of currency exchange spreads on international money transfers. During 2007 and 2008 MoneyGram derived the bulk of its gross revenues-- $852,749,000 and $1,000,815,000, respectively--from its money transfer business.

Petitioner does not rely on any aspect of its money transfer business in support of its contention that it is a "bank." In its opening memorandum on remand, petitioner states that its money transfer activity is "not at issue and represent[s] a separate line of business." In its answering memorandum on remand it states that "[m]oney transfers are not relevant to any issue in this case." Petitioner thus concedes that its money transfer activity does not involve either "receiving deposits" or "making loans and discounts." See sec. 581.

2. Money Orders

In 2007 MoneyGram was the leading issuer of money orders in the United States. It sells money orders under the MoneyGram brand, on a private label basis, and under cobranding arrangements with retail agents. Consumers who purchase money orders--sometimes described as consumers who are "underbanked"--often lack access to (or choose not to take advantage of) the full range of services traditionally offered by banks.

When asked why they purchased money orders, customers responding to a survey conducted by MoneyGram replied: "to pay personal bills" (65%), "to pay for goods or services" (43%), "to help a friend" (21%), to make "a gift" (15%), and "to invest in a business" (4%). Customers in the survey indicated that they preferred money orders over other payment methods, such as cash or bank checks, because of the "security of * * * [the] transaction" (41%), because the "transaction can be tracked" (40%), because money orders are "required by biller" (32%), and because cash "is not accepted everywhere" (23%).

MoneyGram sells money orders through agents--generally, the same types of agents through which it offers money transfer services. To obtain a money order, a customer enters the location of a MoneyGram agent and gives the agent cash equal to the money order amount (plus a fee). The customer receives a blank mon-

ey order in that amount. He completes the money order by filling in the name of the payee (e.g., his landlord) and signing the order. Once presented for payment, the money order is cleared through the Federal Reserve interbank system. Typically, money orders remain outstanding for fewer than ten days.

Occasionally a consumer may decide that he no longer needs the money order to make a payment. In that event he could submit a refund request to Money-Gram along with an additional processing fee. Alternatively, if he had left the payee line on the money order blank, he could write his own name on that line and redeem the money order for cash. But in neither case could the consumer recover the fees he had paid to MoneyGram and its agent.

MoneyGram executes with each of its agents a Master Trust Agreement (MTA) under which the agent accepts appointment as "Trustee" for MoneyGram (referred to as "Company"). The MTA "authorizes Trustee to sell Company's products and services at authorized locations" and outlines the agent's responsibilities, as Trustee, with respect to funds collected from consumers.

A typical MTA defines "Trust Funds" as "fees, face amounts of money orders, gift certificates, money transfer checks, principal amounts of * * * money transfers and all proceeds from the sale of the Services." The agent "agrees to hold Trust Funds in trust for Company and separate from Trustee's funds." "If

Trust Funds become commingled with other funds, the total commingled funds are impressed with a trust and shall belong and are payable to Company to the extent of amounts due Company from Trustee." MTAs typically state that "Trustee grants to Company a continuing security interest in the Trust Funds." Some MTAs give MoneyGram a security interest in the agent's other assets and state that MoneyGram has "all rights of a secured party under the Uniform Commercial Code." And some MTAs require the owners of incorporated agents to supply personal guaranties.

MoneyGram historically has taken the position that an MTA creates an express trust that gives it a preferred position over its agent's other creditors in the event of its agent's bankruptcy. In at least 27 bankruptcy proceedings filed by its agents, MoneyGram has contended that it is not an ordinary creditor because the MTA gives rise to a fiduciary relationship between MoneyGram and its agent. For that reason MoneyGram has asserted that its agent's failure to pay over Trust Funds constituted "defalcation while acting in a fiduciary capacity," 11 U.S.C. sec. 523(a)(4) (2006), so that the agent's debts to MoneyGram were not dischargeable.[2]

---

[2] See, e.g., Motion for Summary Judgment, at 11, MoneyGram Payment Sys., Inc. v. Vazquez-Lago (In re Vazquez-Lago), Bankruptcy No. 07-07643 (Bankr. D. P.R. 2008) ("Defendants breached their fiduciary duties under an express trust by failing to deliver to MPSI, trust funds in accordance with the provisions of the
(continued...)

The MTAs typically require the agent to remit Trust Funds "in accordance with the remittance schedule for the Service." For money orders, the remittance schedule is set forth in the MTA or in a Money Order Attachment, which is explicitly made "part of the Master Trust Agreement." Wal-Mart remitted Trust Funds daily by bank wire. Some agents remitted Trust Funds once a week. But most agents were required to remit Trust Funds to MoneyGram twice a week, depending on the terms the particular agent had negotiated and MoneyGram's evaluation of the agent's credit.

For example, the MTA executed by 7-Eleven Stores provided that receipts from money order sales would be remitted to MoneyGram on Thursday (for sales made during the immediately preceding Sunday, Monday, and Tuesday), and on Tuesday (for sales made during the immediately preceding Wednesday, Thursday, Friday, and Saturday). In each case Trust Funds were to be remitted by wire transfer and received by MoneyGram no later than 2 p.m. central time on the date

---

[2](...continued)
Trust Agreement."); Brief in Support of Motion for Summary Judgment, at 8, MoneyGram Payment Sys., Inc. v. Laughman (In re Laughman), No. 07-06739-BHL-7 (Bankr. S.D. Ind. 2007) ("The Debtors committed defalcation while acting in their fiduciary capacity * * * by intentionally failing to remit, or having insufficient funds to remit, to MPSI all money order trust funds over which they had control and a preexisting duty, and by commingling, converting and misappropriating trust funds.").

due. The MTA provided that MoneyGram "shall charge Trustee a late fee of 2% of any late payment of Trust Funds."

Most MTAs in the record include remittance schedules resembling the 7-Eleven Stores schedule: Agents were required to remit Trust Funds twice weekly, with a one-day grace period between the final sales day and the required remittance. But the MTAs vary regarding the consequences of late payment. Most agreements in the record provide that MoneyGram will charge a fixed-dollar amount (e.g., $40) or "interest at the highest rate allowed by law," whichever amount is greater. Some agreements provide for a "service fee" in a fixed-dollar amount (e.g., $75), with interest beginning to accrue if the payment is more than one day late. The Wal-Mart agreement provides that interest accrues, but without any service fee. Unlike any other MTA in the record, the 7-Eleven Stores agreement provides for a late fee stated as a percentage of the late remittance.

The MTA executed by the Money Store differs from all other MTAs in the record. This agreement contains an additional provision concerning "Delayed Remittances." It provides that, notwithstanding the normal remittance schedule:

> [U]p to two (2) times per calendar year, Trustee shall be granted the option to delay its weekly remittance of Trust Funds (representing its weekly money order sales) for a period of no longer than one (1) week (the "Delayed Remittance"). In this instance, the Delayed Remittance will be paid to Company on the following Wednesday, along

with any regularly scheduled remittance for that day. Trustee shall notify the Company of its desire to take advantage of the Delayed Remittance at least thirty (30) days prior to the first day of the sales week for which the Delayed Remittance will take place, and approval by the Company shall not be unreasonably withheld. Delayed Remittances shall not occur during consecutive sales weeks.

If the Money Store exercised this option, MoneyGram charged "interest on the Delayed Remittance at a per annum rate equal to 1% above Prime for the use of these funds." If the Money Store failed to remit Delayed Remittance funds within one week as required, the interest rate increased to 2% above Prime.

Petitioner submitted no evidence to establish the number of MoneyGram agents that had "Delayed Remittance" options of the sort contained in its MTA with the Money Store. The record contains a total of 30 MTAs--the two discussed above, an MTA executed by Wal-Mart, and 27 MTAs executed by agents that filed for bankruptcy. The Money Store MTA is the only agreement that affords the agent a "Delayed Remittance" option.[3]

Petitioner submitted no evidence to establish whether agents other than the Money Store had a Delayed Remittance option. Petitioner submitted no evidence

---

[3]The record includes affidavits in which petitioner's officers refer to "delayed remittances." They appear to use this term loosely to refer, not only to an explicit "Delayed Remittance" option of the sort specified in the Money Store MTA, but to all remittances made by all agents according to their regular remittance schedules. A thorough search of the 30 MTAs in the record reveals that the term "Delayed Remittance" appears only in the Money Store MTA.

to establish how often (if ever) agents whose MTA included a "Delayed Remittance" option exercised that option. Petitioner submitted no evidence to establish the dollar amount of interest income (if any) that it received from its agents in 2007 or 2008, either on "Delayed Remittances" or in the form of late fees on remittances received after the due date specified in the regular remittance schedule.

On its consolidated financial statements MoneyGram treated funds due from its money order agents as accounts receivable. As far as the record reveals, MoneyGram treated such amounts as accounts receivable regardless of whether the funds were to be remitted under the normal remittance schedule or as "Delayed Remittances." At no time did MoneyGram show either category of outstanding remittances as "loans" on its consolidated financial statements.

MoneyGram typically received a sales fee from its agents for each money order sold. It also derived revenue from the temporary investment of funds remitted by its agents. MoneyGram earned income on these funds (and could suffer investment losses) until the money orders cleared through the banking system or (if never presented for payment) escheated to the relevant State. Outstanding money orders were classified as "payment service obligations" and treated as liabilities on MoneyGram's consolidated financial statements.

As a publicly held corporation, MoneyGram filed with the Securities and Exchange Commission (SEC) Forms 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. On its 2007 and 2008 Forms 10-K, MoneyGram reported "fee and other revenue" from its retail money order business (before commissions expenses) of $58.6 million and $65.8 million, respectively. It allocated to its retail money order business investment losses (i.e., investment income minus securities losses) of $135.9 million and $21.2 million, respectively.

B.    Payment Systems

Whereas money transfers and retail money orders involve transactions with individual consumers, MoneyGram through its Payment Systems segment provides services to financial institutions. These services generally consist of payment processing, including the processing of "official checks." Smaller financial institutions, such as credit unions and community banks, often find it economical to outsource these activities to firms such as MoneyGram.

Financial institutions provide their customers with official checks, such as bank checks, cashier's checks, and teller's checks, for use in various transactions. Official checks are commonly used in closings of home loans and consumer car loans. In such situations, the payee usually will not accept a personal check but

demands the assurance of payment and availability of funds that official checks supply. Financial institutions sometimes use official checks to pay their own obligations. In 2007 MoneyGram provided official check services to more than 1,900 financial institutions, consisting mainly of banks, credit unions, and thrifts.[4]

Typically, MoneyGram and its customer (say a bank) execute a payment processing services agreement that lasts up to five years. Before the first day on which the bank issues official checks, it supplies MoneyGram with funds equal to its anticipated average daily volume of official checks. This is called the "first day settlement." At the end of each business day, the bank generates a settlement report showing the dollar volume of official checks it issued that day. The bank then transfers funds in that amount to MoneyGram, typically before 11 a.m. central time the next business day. MoneyGram pays the bank interest on the average daily balance of funds thus advanced to MoneyGram.

When an official check is presented for payment, it is cleared through the Federal Reserve interbank system in the same way as a check drawn on a checking account. As official checks clear, the bank's account balance with MoneyGram is

---

[4]In some circumstances MoneyGram also supplied money orders that financial institutions could sell to their banking customers. The record does not disclose the extent of this activity, and MoneyGram does not rely upon this activity in support of its contention that it is a "bank." Rather, MoneyGram relies exclusively on its "official check" business for financial institution customers.

drawn down, but it is replenished with funds from the next day's settlement report. If a bank issues significantly more official checks than anticipated, its account balance with MoneyGram may temporarily go negative. In that event, MoneyGram will allow the bank's official checks to clear, but it will demand payment from the bank that same business day. Outstanding official checks are classified as "payment service obligations" and treated as liabilities on MoneyGram's consolidated financial statements.

MoneyGram receives fees from financial institutions for its "official check" services. MoneyGram also derives revenue (and may suffer investment losses) from the temporary investment of funds remitted from its customers until official checks clear. On its 2007 and 2008 Forms 10-K, MoneyGram reported "fee and other revenue" from official check and payment processing services (before commissions expense) of $13.5 million and $16.7 million, respectively. It allocated to this revenue stream investment losses (i.e., investment income minus securities losses) of $643.8 million and $152.4 million, respectively.

## II. Regulation of and Reporting by MoneyGram

MoneyGram is registered with the Department of the Treasury as a "money services business" (MSB). MSBs include money transmitters, check cashing services, issuers of money orders, and issuers of travelers checks. MoneyGram is

subject to regulation under title 31 of the U.S. Code and title 31 of the Code of Federal Regulations, which govern "Money and Finance." Title 31 applies to a variety of other businesses including car dealers, currency exchanges, and insurance companies. See, e.g., 31 U.S.C. sec. 5312(a)(2) (2006). Other money transmitters and check issuers, such as Western Union and American Express Travel Related Services, are also regulated as MSBs.

As an MSB, MoneyGram is subject to anti-money-laundering laws, State licensing requirements, and laws covering data protection, consumer protection, and consumer privacy. MoneyGram is licensed and regulated as a money transmitter by 48 States, the District of Columbia, and U.S. possessions.[5] To be licensed as a money transmitter, MoneyGram must satisfy State requirements concerning minimum net worth and compliance with operational procedures. It must also maintain reserves adequate to meet its outstanding payment service obligations. Most States require that, if securities are held to satisfy reserve requirements, they be U.S. Government securities or other highly-rated debt instruments.

Banks are generally regulated under title 12 of the U.S. Code and title 12 of the Code of Federal Regulations, which govern "Banks and Banking." All U.S.

---

[5]Montana and South Carolina, the only States that did not license Money-Gram as a money transmitter during 2007 and 2008, had no licensing requirements for such entities.

banks are subject to supervisory regulation by one or more Federal banking regulators, viz., the Federal Reserve Board, the Office of the Comptroller of the Currency, and/or the Federal Deposit Insurance Corporation (FDIC).  Banks that receive deposits generally maintain deposit insurance through the FDIC.

No MoneyGram affiliate is incorporated as a bank under State law.  As a licensed money transmitter, MoneyGram is subject to some form of financial regulation in every State in which it does business.  As a rule, it is subject to supervision by officials of the State banking (or similar) department.

As a money transmitter, MoneyGram is subject to regulation under some provisions of title 12, but it has never been regulated as a "bank" by any Federal banking regulator.  MoneyGram has never maintained deposit insurance with, or paid deposit insurance premiums to, the FDIC.[6]

---

[6]During the 2008-2010 financial crisis the FDIC created the Temporary Liquidity Guarantee Program (TLGP) to enhance public confidence in the banking system.  See FDIC Financial Institution Letter, Temporary Liquidity Guarantee Program, FIL-103-2008 (Oct. 15, 2008).  Under this program the FDIC extended its guaranty to cover certain non-interest-bearing deposits held by banks and other FDIC-insured institutions.  Many of MoneyGram's official check customers (i.e., banks) were eligible for and elected coverage under the TLGP.  Upon making this election, the funds a bank received from its retail customers in payment for "official checks" were insured by the FDIC.  The funds that MoneyGram received from its bank customers under its payment processing services agreements were not covered under the TLGP and were not insured by the FDIC, because MoneyGram is not an FDIC-insured institution.

As a publicly held corporation, MoneyGram files quarterly and annual reports with the SEC. MoneyGram has never represented to the SEC or to its shareholders that it is a "bank" or that any part of its business consists of receiving deposits or making loans. The financial statements that accompany MoneyGram's Forms 10-K do not list any "loans" among its assets and do not list any "deposits" among its liabilities.

For 2005-2007 MoneyGram filed with the IRS annually Form 1120, U.S. Corporation Income Tax Return. On these returns MoneyGram classified its business as "nondepository credit intermediation" (business activity code 522298). Activities within "nondepository credit intermediation" include money transmitting, check clearing, and loan brokering. On none of these returns did MoneyGram classify its business as "depository credit intermediation" (business activity codes 522110, 522120, 522130, and 522190). Activities within "depository credit intermediation" include the activities of commercial banks, savings institutions, credit unions, and other financial institutions that accept deposits.

For 2008 MoneyGram filed with the IRS a Form 1120 that again classified its business as "nondepository credit intermediation." But while continuing to use business activity code 522298, MoneyGram changed the descriptions of its business activity and its products and services. Whereas prior returns had described its

business activity as "payment services/credit agency," its 2008 return stated that its business activity was "banking." And whereas prior returns had described its products and services as "money/wire transfers," its 2008 return stated that its products and services were "financial services." No meaningful change in Money-Gram's mode of operation occurred between 2007 and 2008.

III.    MoneyGram's Investments

As a money transmitter MoneyGram was required by State regulators to maintain reserves at least equal to the outstanding face amount of its payment service obligations. As a rule, these reserves were required to be held in the form of cash, U.S. Government obligations, and investment securities rated single-A or higher. During 2007 and 2008 MoneyGram's reserve assets included investments in commercial paper and asset-backed securities.

In the U.S. financial market, commercial paper (CP) refers to unsecured promissory notes issued by corporations with a fixed maturity of no more than 270 days. At year-end 2007 the outstanding volume of CP in the U.S. market, issued by several thousand corporations, exceeded $1.78 trillion.[7] CP is invariably issued at a discount to the face amount of the obligation. The discount--referred to as

---

[7]See Commercial Paper Outstanding, Federal Reserve Economic Data, https://fred.stlouisfed.org/series/COMPOUT (last visited Nov. 1, 2019).

"original issue discount" (OID)--represents unstated interest that the investor receives when he sells the instrument or receives its face amount at maturity. For Federal tax purposes, OID is generally taxed as ordinary income. See sec. 1271(a)(4).

During 2007 and 2008 MoneyGram invested in CP with maturities as short as one day and as long as 270 days. The parties have stipulated that MoneyGram during 2007 "held an aggregate of $66 billion" of CP. Because MoneyGram's total assets at year-end 2007 were less than $8 billion, it does not appear to have held $66 billion of CP at any one time. The $66 billion figure stipulated by the parties appears to be the total volume of MoneyGram's purchases of CP during 2007. MoneyGram's year-end balance sheet for 2007 shows only $1.4 billion in "total cash and cash equivalents."

MoneyGram invested in CP to earn a return on cash balances that it held pending clearance of money orders and official checks through the banking system. During 2007 MoneyGram purchased CP on about 2,400 occasions, typically from broker-dealers or other agents, including Bear Stearns, Merrill Lynch, and Citigroup. Petitioner identified 118 occasions during 2007 in which it purchased CP directly from the issuer. On 88 of these occasions the CP had a maturity of one day (sometimes referred to as "overnight CP"); on the other 30 occasions the CP

had maturities ranging from two days to seven days. The aggregate dollar value of the CP MoneyGram purchased directly from issuers during 2007 was about $5.8 billion. It earned income of approximately $1.2 million from these CP investments, all in the form of OID.

During 2007 and 2008 MoneyGram's reserves were also invested (unhappily for it) in asset-backed securities. These securities were typically issued by a trust or a special-purpose entity to which a pool of residential mortgage loans (or tranches of such loans, or other types of loans) had been contributed. The trust issued, typically to underwriters, debt securities backed by these loans, and the underwriters sold the securities to investors, including MoneyGram.

MoneyGram might purchase an interest in an asset-backed security from the underwriter, or it might purchase such securities from broker-dealers in the after-market. In either case, the security might trade at a discount to the aggregate principal balance of the underlying mortgages. This discount depended in part on the mortgages' expected default rate. The discount could change (for example) if interest rates generally had increased, if economic conditions had deteriorated, or if the loans backing the security were perceived by investors as having declined in value owing to increased risk of default.

IV.   The Present Controversy

At the beginning of 2007 MoneyGram held asset-backed securities valued at approximately $4.2 billion. During 2007 and 2008 global financial markets experienced turmoil. In response, ratings agencies undertook reviews of asset-backed securities, especially mortgage-backed securities. Many of these securities, formerly rated single-A or higher, were suddenly downgraded to (or near) "junk bond" status. These securities lost much of their value.

Because its asset-backed securities were no longer highly rated and had declined precipitously in value, MoneyGram by year-end 2007 had fallen out of compliance with State requirements concerning permissible reserves and minimum net worth. To satisfy State regulators' demands and ensure sufficient operational liquidity, MoneyGram undertook a recapitalization that included writing down or writing off a substantial volume of partially or wholly worthless asset-backed securities. Upon completion of this recapitalization in March 2008, MoneyGram brought itself back into compliance with State regulatory demands.

As a result of this recapitalization MoneyGram reported on its 2007 and 2008 Federal income tax returns substantial losses with respect to its asset-backed securities portfolio. These securities fell into two categories: REMIC and non-REMIC. The parties have filed a stipulation of settled issues that resolves all mat-

ters arising from the IRS' disallowance of deductions in connection with Money-Gram's disposition of its regular REMIC interests.

The sole question that remains for decision concerns MoneyGram's disposition of its non-REMIC asset-backed securities. On its 2007 and 2008 Federal income tax returns MoneyGram claimed under section 166(a) bad debt deductions of $524,435,525 and $16,516,192, respectively, on account of the partial or complete worthlessness of those securities. (Treating these losses as capital losses would have generated no current tax benefit for MoneyGram because it had no capital gains net income against which capital losses could be offset.)

The IRS determined that these securities were "debts evidenced by a security" under section 165(g)(2)(C) and hence that MoneyGram could claim bad debt deductions, as opposed to capital losses, only if it were a "bank" within the meaning of section 581. See sec. 582(a). The IRS determined that MoneyGram was not a "bank" and hence disallowed the bad debt deductions. Following the Fifth Circuit's remand, the parties have presented this question for resolution by renewed cross-motions for summary judgment.[8]

_____

[8]MoneyGram contends that it made an informal claim for refund that increased by $14,760,201 its bad debt deduction for 2007. Given our disposition we need not address the magnitude of the deduction.

## Discussion

### I. Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid unnecessary and expensive trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002). A party opposing summary judgment "may not rest upon the mere allegations or denials of such party's pleadings, but * * * must set forth specific facts showing that there is a genuine dispute for trial." Rule 121(d); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The parties agree on all questions of basic fact and have expressed that consensus by filing cross-motions for summary judgment. We conclude that the question presented is appropriate for summary adjudication.

### II. Governing Statutory Framework

Section 165 governs "Losses." Petitioner concedes that "non-REMIC asset-backed securities" are debts evidenced by a "security" within the meaning of section 165(g)(2)(C). Thus, losses realized on the worthlessness of petitioner's non-REMIC asset-backed securities would normally be treated as losses "from the sale

or exchange, on the last day of the taxable year, of a capital asset." Sec. 165(g)(1). For corporations, capital losses for a particular year are deductible only to the extent of capital gains for that year. Sec. 1211(a).

Section 166, captioned "Bad Debts," allows a deduction for any debt that "becomes [wholly] worthless" or becomes "recoverable only in part" during the taxable year. Sec. 166(a). Section 166(e), however, provides that "[t]his section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C)." Because non-REMIC asset-backed securities are debts "evidenced by a security," taxpayers generally are not entitled to bad debt deductions on account of the partial or complete worthlessness of these securities.

Banks are entitled to special treatment. Section 582(a) provides that "[n]otwithstanding sections 165(g)(1) and 166(e), subsections (a) and (b) of section 166 (relating to allowance of deduction for bad debts) shall apply in the case of a bank to a debt which is evidenced by a security as defined in section 165(g)(2)(C)." The term "bank" is defined in section 581. The question presented is whether MoneyGram qualifies as a "bank" under this definition.

III.    Analysis

Section 581 provides in relevant part:

> For purposes of sections 582 and 584, the term "bank" means a bank or trust company incorporated and doing business under the laws of the United States * * * or of any State, a substantial part of the business of which consists of receiving deposits and making loans and discounts, * * * and which is subject by law to supervision and examination by State or Federal authority having supervision over banking institutions. * * *

In our initial Opinion, we interpreted section 581 to impose three distinct requirements that an entity must meet in order to qualify as a "bank." See MoneyGram I, 144 T.C. at 10. First, the entity must be "a bank or trust company incorporated and doing business" under Federal or State law. Ibid. We interpreted this first requirement to mean that the entity must "possess[] the essential characteristics of a bank as that term is commonly understood." Id. at 15. Second, "a substantial part" of the entity's business must "consist[] of receiving deposits and making loans and discounts." Third, the entity must be "subject by law to supervision and examination" by Federal or State authorities having supervision over banking institutions.

In round one of these cases, petitioner argued in effect that the first requirement listed above does not exist. Noting the circularity of a definition that begins, "the term 'bank' means a bank," petitioner contended that section 581 requires

only that the taxpayer be incorporated and that it "accept deposits, make loans, and be regulated by a banking authority." Ibid. We rejected that contention as a matter of statutory construction, noting that petitioner's argument would "render[] meaningless the principal clause of the first sentence of section 581." Ibid.

Petitioner renewed its argument on appeal, but the Fifth Circuit likewise rejected it. The Fifth Circuit decided that "the most consistent and harmonious reading of this section [viz., section 581] supports the Tax Court's conclusion that being a 'bank' within the commonly understood meaning of that term is an independent requirement." MoneyGram II, 664 F. App'x at 389. The Fifth Circuit agreed with our conclusion "that 'bank' as used in § 581 imposes an independent element and should be given its common meaning." Id. at 391; see id. at 390 ("Section 581 * * * requir[es] that a taxpayer seeking to take advantage of this tax benefit * * * engage in the touchstone activities of a bank.").

While agreeing that section 581 imposes, as an initial requirement, that the taxpayer be a "bank" within the commonly understood meaning of that term, the Fifth Circuit disagreed with the manner in which we had "defined 'deposits' and 'loans' as relevant both to this inquiry and § 581's later requirement that a substantial part of the taxpayer's business consist of receiving deposits and making loans." Id. at 392. The Fifth Circuit also directed that we consider on remand

"whether MoneyGram makes 'discounts,'" a question that neither we nor the parties had previously addressed. Id. at 394. In the pages that follow we reevaluate MoneyGram's entitlement to "bank" status under the revised standards enunciated by the Fifth Circuit.

A.    Bank or Trust Company

The first statutory requirement is that the taxpayer be a "bank or trust company incorporated and doing business under the laws of the United States * * * or of any State." MoneyGram is incorporated and doing business under State law, and it does not contend that it is a trust company. We accordingly must decide whether it is a "bank" within the common understanding of that term. See Money-Gram II, 664 F. App'x at 391; cf. Fathauer v. United States, 566 F.3d 1352, 1355 (Fed. Cir. 2009) (ruling that the term "employee," when defined by statute in a circular manner, "was intended to be given its ordinary meaning"); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Devon Bank, 832 F.2d 1005, 1006 (7th Cir. 1987) ("Perhaps the statute uses a circular definition because the elements of banking are not particularly obscure.").

In the seminal case in this area, the Fourth Circuit interpreted the predecessor of section 581 consistently with these principles. See Staunton Indus. Loan Corp. v. Commissioner, 120 F.2d 930 (4th Cir. 1941), rev'g 42 B.T.A. 1030

(1940). The question in Staunton was whether an entity chartered as an "industrial loan corporation" under Virginia law was a "bank" within the meaning of section 104(a) of the Revenue Act of 1936 (1936 Act), ch. 690, 49 Stat. at 1677. The Fourth Circuit held that "the peculiarities of state laws" were not determinative in answering this question, reversing the Board of Tax Appeals (this Court's predecessor) on that point. See Staunton, 120 F.2d at 932, 934. The Fourth Circuit thus held that an entity can be a "bank" for Federal tax purposes even though it is not chartered as a bank under State law.

The Fourth Circuit in Staunton then considered the definition of "bank" set forth in section 104(a) of the 1936 Act, which was essentially the same as the current definition in section 581. See Austin State Bank v. Commissioner, 57 T.C. 180, 186 (1971) (noting that section 581 and its predecessor statute encompass "nearly the same elements"). The predecessor section 104(a) provided that "the term 'bank' means a bank or trust company incorporated and doing business" under Federal or State law, "a substantial part of the business of which consist[ed] of receiving deposits and making loans and discounts," and which was "subject by law to supervision and examination" by Federal or State banking authorities. 1936 Act sec. 104(a), 49 Stat. at 1677. The Fourth Circuit in Staunton determined that the taxpayer received deposits and made loans and was subject to supervision by

Virginia banking authorities. <u>Staunton</u>, 120 F.2d at 932. But the court's analysis did not stop there. It went on to consider the "sum total of petitioner's business activities" to ascertain whether "petitioner comes within the classification set out in section 104 of a 'bank', and within the general meaning of that term." <u>Ibid.</u>

The Fourth Circuit concluded that an entity must manifest three basic features to bring itself "within the commonly understood definition of a 'bank'." <u>Id.</u> at 934. The court summarized those features as: "(1) the receipt of deposits from the general public, repayable to the depositors on demand or at a fixed time, (2) the use of deposit funds for secured loans, and (3) the relationship of debtor and creditor between the bank and the depositor." <u>Id.</u> at 933-934. The Fourth Circuit determined that the industrial loan company displayed these features, which it described as "the bare requisites" for bank status. <u>Id.</u> at 934. The Fourth Circuit has described the "interpretative technique" employed in <u>Staunton</u> as "a practical, commercial, functional approach" to determining what constitutes a "bank." <u>Magruder v. Safe Deposit & Tr. Co. of Balt.</u>, 121 F.2d 981, 985 (4th Cir. 1941).

In our original Opinion in these cases we adopted the <u>Staunton</u> Court's three-pronged approach for determining whether an entity is a "bank" within the common understanding of that term. See <u>MoneyGram I</u>, 144 T.C. at 12-14. The

Fifth Circuit on appeal likewise embraced the Staunton Court's three-pronged approach, stating: "We agree with this definition as its components are consistent with the relevant case law and dictionaries." MoneyGram II, 664 F. App'x at 391. We will address each of these components in turn.

## 1.    Receipt of Deposits

The term "deposits" as used in section 581 is not defined in the statute, the regulations, or the legislative history. To discern its meaning we employ the standard tools of construction, including "considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Dolan v. USPS, 546 U.S. 481, 486 (2006); see Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Because section 581 "refers to deposits in the banking context," the term "deposits" as used in section 581 has "a narrower definition than its broadest possible meaning." MoneyGram II, 664 F. App'x at 392. The "[t]erm 'deposit' always has had a meaning of its own, 'peculiar to the banking business, and one that courts should recognize and deal with according to commercial usage and understanding.'" Ibid. (quoting Commissioner v. Valley Morris Plan, 305 F.2d

610, 616 (9th Cir. 1962), rev'g in part 33 T.C. 720 (1960) and 33 T.C. 572 (1959)).  The Fifth Circuit largely agreed with our definition of "deposits" but held that we had "erred by interpreting 'deposit' to include the requirement that MoneyGram 'hold its customers' funds for extended periods of time.'"  Money-Gram II, 664 F. App'x at 393 (quoting MoneyGram I, 144 T.C. at 19).  We accordingly excise that requirement in reevaluating whether MoneyGram "receives deposits."

At least since Staunton, courts have held that business realities, rather than labels, control in determining whether a bank "receives deposits" within the meaning of section 581 and its predecessors.  Under this functional approach, courts have ascertained whether a bank receives deposits by considering the purpose for which customers transfer the funds and the terms under which the bank holds the funds.  The Fourth Circuit noted in Staunton:  "Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution.  Originally the business of banking consisted only in receiving deposits, such as bullion, plate, and the like, for safe-keeping until the depositor should see fit to draw it out for use."  Staunton, 120 F.2d at 934.

The Fifth Circuit agreed that an essential element of a bank deposit is "the placement of funds * * * for 'safekeeping.'"  MoneyGram II, 664 F. App'x at 392

(citing Engel v. O'Malley, 219 U.S. 128, 136 (1911) ("The receipt of money by a bank * * * is in a popular sense the receipt of money for safekeeping.")); see Valley Morris Plan, 305 F.2d at 622 ("Depositors [who purchase thrift certificates] place their money in banks primarily for safekeeping."); Jackson Fin. & Thrift Co. v. Commissioner, 260 F.2d 578, 582 (10th Cir. 1958) ("Depositors place their money in banks primarily for safekeeping."), rev'g 29 T.C. 272 (1957); Nat'l Bank of Commerce v. Commissioner, 16 T.C. 769, 772 (1951) ("The main purpose of a deposit is safe-keeping."). State courts, as well as Federal courts, have defined "deposits" in this way. See, e.g., Appeal of Metro. Life Ins. Co., 164 A. 715, 717 (Pa. 1932) ("The term 'depositor' must be understood in its popular sense, as one who has intrusted money to a bank for convenient safe-keeping, subject to his control.").

The second essential element of a bank deposit is that the funds "must be subject to the control of the depositor such that they are repayable on demand or at a fixed time." MoneyGram II, 664 F. App'x at 392; see Staunton, 120 F.2d at 933-934 (characterizing bank deposits as funds "repayable to the depositors on demand or at a fixed time"); 5A Michie on Banks and Banking, ch. IX, sec. 3, LEXIS (database updated May 2019) ("The term 'deposit' signifies the act of

placing money in the 'custody' of a bank, to be withdrawn at the will of the depositor.").

A third characteristic of bank deposits is that they are received "from the general public." Staunton, 120 F.2d at 934. The Fifth Circuit agreed with this aspect of the Staunton test. See MoneyGram II, 664 F. App'x at 391. The Fifth Circuit likewise expressed agreement with the Fourth Circuit's subsequent opinion in Magruder, which held that an institution was not a "bank" because it "did not receive deposits from the general public." Ibid. (quoting Magruder, 121 F.2d at 985).

MoneyGram contends that two aspects of its business involve receipt of bank deposits: its "official check" services for financial institutions and its sale of money orders to individual retail consumers. We examine these contentions in turn.

### a. Official Check Services

MoneyGram provided official check services to more than 1,900 financial institutions, consisting mainly of banks, credit unions, and thrifts. MoneyGram and its customer typically executed a "payment processing services agreement." Before the first day on which the customer issued official checks, it supplied MoneyGram with funds equal to its anticipated average daily volume of official

checks. This was called the "first day settlement." At the end of each business day the customer generated a settlement report showing the dollar volume of official checks it issued that day. The customer then transferred funds in that amount to MoneyGram, typically before 11 a.m. central time the next business day. MoneyGram contends that the funds advanced to it by its official check customers constituted bank "deposits."

We disagree. The financial institutions that purchase official check services from MoneyGram do not advance funds to MoneyGram "for the purpose of safe-keeping." MoneyGram II, 664 F. App'x at 392. All of MoneyGram's "official check" customers are financial institutions, and they presumably have ample means of keeping their cash safe. MoneyGram accepts these funds, not to satisfy its customers' need to protect their cash from risk of loss, but to protect itself from risk of loss in the event its customer should default or delay in payment.

The advance of funds that MoneyGram receives from an "official check" customer resembles a retainer that a law firm receives from a client, or a security deposit that a landlord receives from a tenant. Law firms often require clients to submit retainers at the outset of a representation to protect themselves against the risk of nonpayment. The law firm bills against the retainer; when the retainer nears exhaustion, the client is commonly required to replenish the retainer. This

process of billing and replenishment continues until the end of the representation, at which point any funds remaining in the retainer are returned to the client. See generally Barron v. Countryman, 432 F.3d 590, 595-596 (5th Cir. 2005) (discussing retainer agreements). Security deposits work much the same way: The landlord returns the security deposit to the tenant at the end of the lease, provided that the tenant has paid all rent and not damaged the property. See generally Mantell v. Commissioner, 17 T.C. 1143 (1952) (discussing security deposits).

Neither the tenant who makes a security deposit nor the client who submits a retainer is advancing funds for the purpose of safekeeping. Each person advances funds, not to satisfy his own need to keep his cash safe, but to satisfy the demand of the other contracting party for assurance of payment. The same is true for the financial institutions that purchase official check services from MoneyGram.

Petitioner replies that its financial institution customers generally view it as a safe place to leave money. While that may be true, this argument misconceives the focus of the inquiry. Our inquiry focuses on the purpose of the purported depositor. As the Fifth Circuit stated, bank deposits are "funds that customers place in a bank for the purpose of safekeeping." MoneyGram II, 664 F. App'x at 392 (emphasis added). Clients may regard law firms (and tenants may regard land-

lords) as safe repositories for cash. But it does not follow that they pay retainers or make security deposits for the purpose of safekeeping.

The advances that MoneyGram seeks to characterize as bank deposits are in effect security deposits that it demands--for its own protection--to ensure that it has funds available when official checks are presented to it for payment. Like law firm retainers, these advances constitute, not bank deposits, but prepayments for a service. As an MSB, MoneyGram appears to be prohibited by law from receiving bank deposits. See 12 U.S.C. sec. 378 (2006). Its public financial statements describe these funds not as "deposits" but as "payment service obligations." Its Federal income tax returns have historically described its business as "nondepository credit intermediation." These characterizations are consistent with our conclusion that MoneyGram's official check activity does not involve the receipt of bank deposits because its customers do not advance funds to it for the purpose of safekeeping.[9]

_____

[9]Concluding as we do that MoneyGram's customers do not advance funds for the purpose of safekeeping, we need not decide whether those advances, if deemed "deposits," should be regarded as received "from the general public." See MoneyGram II, 664 F. App'x at 391; Staunton Indus. Loan Corp. v. Commissioner, 120 F.2d 930, 933-934 (4th Cir. 1944), rev'g 42 B.T.A. 1030 (1940). "[T]he requirement that deposits be made from the 'general public,'" the Fifth Circuit noted, is meant "to differentiate between deposits received from sources in some way connected with the bank and those received from ordinary and unrelated custom-

(continued...)

### b.    Retail Sale of Money Orders

Petitioner alternatively contends that its retail money order business involves the receipt of "deposits." To obtain a money order, a consumer enters the location of a MoneyGram agent (say a convenience store) and gives the agent cash equal to the money order amount (plus a fee). The consumer receives a blank money order, which he completes by filling in the name of the payee (say his landlord) and signing the order. The convenience store holds the proceeds of money order sales as Trust Funds for MoneyGram and remits those proceeds to MoneyGram, generally semi-weekly.

Since these transactions take the form of retail sales, as opposed to banking transactions, it is first necessary to identify the purported "depositor" on petitioner's theory. In official check transactions, the supposed "depositor" was the financial institution that transferred to MoneyGram the funds out of which MoneyGram would pay official checks when presented for payment. In money order transac-

---

[9](...continued)
ers of banking services." Moneygram II, 664 F. App'x at 391 (quoting Austin State Bank v. Commissioner, 57 T.C. 180, 187 (1971)). The advances that MoneyGram seeks to characterize as deposits can be made only by financial institutions that have preexisting contractual relationships with it. Because ordinary customers of banking services cannot make such advances, respondent contends that MoneyGram's official check business does not involve "the receipt of deposits from the general public." Staunton, 120 F.2d at 933-934. Given our disposition, we need not decide that question.

tions, the "depositor" would seem to be the agent that transfers to MoneyGram the funds out of which MoneyGram will pay money orders when presented for payment.

If MoneyGram's agent is the purported "depositor," it is clear that the transferred funds are not "deposits." The agent holds the funds as Trustee for Money-Gram, which is the equitable owner while the funds are in the agent's possession. Once the agent remits Trust Funds to MoneyGram, the agent can never get them back. The agent cannot be viewed as transferring funds to MoneyGram "for the purpose of safekeeping," MoneyGram II, 664 F. App'x at 392, because the funds are not the agent's funds. And the funds, unlike bank deposits, are not "repayable to the depositor on demand or at a fixed time." Ibid.; Staunton, 120 F.2d at 934; cf. Appeal of Metro. Life Ins. Co., 164 A. at 717 (for purposes of State insolvency law guaranteeing preferential payment of "deposits," mortgage collections held by trust company as agent for its principal had "none of the ordinary incidents of a deposit").

Recognizing these problems, petitioner characterizes as "the depositor" the retail consumer who purchases the money order. On petitioner's theory, the consumer makes a "deposit" with the convenience store in an amount equal to the face value of the money order; the convenience store accepts that deposit as

MoneyGram's agent; and the convenience store remits the deposits to MoneyGram to hold until the money orders clear the banking system.

We find this characterization of the transaction no more persuasive as to the existence of bank "deposits." The consumer who buys a money order is purchasing a product, not making a deposit. He intends to use that product as a cash equivalent to pay (for example) his rent or his electric bill. Because he intends to alienate the funds by directing payment to a third party, he cannot be regarded as putting those funds in a safe location for his future use. He cannot be viewed, in other words, as giving money to the convenience store "for the purpose of safe-keeping." MoneyGram II, 664 F. App'x at 392.

MoneyGram's own research shows that consumers do not purchase money orders to make deposits. When asked why they purchased money orders, the consumers surveyed replied: "to pay personal bills" (65%), "to pay for goods or services" (43%), "to help a friend" (21%), and to make "a gift" (15%). All of these consumers indicated that they desired, not to keep their cash safe, but to alienate their funds by directing payment to a third party.

Many consumers in MoneyGram's survey indicated that they preferred money orders over other payment methods, such as cash or bank checks, because of the "security of * * * [the] transaction" (41%), because the "transaction can be

tracked" (40%), because money orders are "required by biller" (32%), and because cash "is not accepted everywhere" (23%). Contrary to petitioner's view, these replies do not show that money order customers give cash to MoneyGram's agents "for the purpose of safekeeping." MoneyGram II, 664 F. App'x at 392. Taken collectively, these replies indicate that consumers regard money order transactions as "secure" because they can be tracked, because they are safer than cash transmissions, and because payees will accept money orders as a guaranteed form of payment. In short, consumers view MoneyGram as offering, not a safe place to keep their money, but a secure way to deliver their money to someone else.[10]

Petitioner insists that consumers rely upon it to maintain assets necessary to honor money orders when presented for payment. That reliance is supported by State licensing laws that require MoneyGram to maintain reserves equal to the face amount of its payment service obligations. But this does not mean that consumers give cash to MoneyGram's agents for safekeeping. Our inquiry focuses on the purpose of the purported depositor. Consumers purchase money orders for the

---

[10]Consumers who use the U.S. Postal Service, United Parcel Service, or Federal Express to ship packages may cite "security of the transaction" as important to them. But the security they desire is efficient delivery of their package in undamaged condition to a third party. Consumers do not give packages to these delivery services "for the purpose of safekeeping."

purpose of delivering money to third-party payees, not for the purpose of enhancing MoneyGram's ability to pay.[11]

Many examples could be used to show that MoneyGram's effort to transmute a retail purchase into a bank deposit proves too much. Retailers often sell gift cards or certificates through agents, including groceries and convenience stores. The agent collects cash from the consumer and remits that cash to the retailer; the consumer delivers the gift card to the donee; and the donee redeems the gift card from the retailer at some future date (or perhaps never). This pattern resembles the pattern by which money orders are sold and ultimately paid. But it could not plausibly be argued that the purchaser of the gift card is making a "deposit" by placing funds with the convenience store "for safekeeping."

In sum, we conclude that neither the cash advanced to MoneyGram by its official check customers nor the cash paid to agents by money order purchasers constitutes a "deposit" for purposes of section 581. As the Fifth Circuit recognized, the term "deposits" as used in section 581 has "a narrower definition than its broadest possible meaning." MoneyGram II, 664 F. App'x at 392. The term

---

[11]Much of petitioner's argument centers on the notion that a money order acts as the substitute for a check, and hence that MoneyGram functions for "underbanked" consumers as the substitute for a bank. That may be true, but it does not follow that MoneyGram is a bank. A train may be a substitute for an airplane when it comes to travel, but it does not mean that a train is a jet.

"deposit" has always had a meaning "peculiar to the banking business, and one that the courts should recognize and deal with according to commercial usage and understanding." Ibid. (quoting Valley Morris Plan, 305 F.2d at 616).

The most essential attribute of a bank deposit is its placement in a bank "for the purpose of safekeeping." MoneyGram II, 664 F. App'x at 392. Neither the financial institutions that purchase MoneyGram's official check services nor the consumers who purchase its money orders transfer funds to MoneyGram for the purpose of safekeeping. Because MoneyGram does not "receive deposits," it is not a "bank" within the ordinary understanding of that term.[12]

### 2. Making Loans

Our conclusion that MoneyGram does not "receive deposits" is sufficient to support our holding that MoneyGram is not a bank "within the commonly understood meaning of that term," MoneyGram II, 664 F. App'x at 389, and thus is not

---

[12]Concluding as we do that money order customers do not advance funds to MoneyGram for the purpose of safekeeping, we need not decide whether those funds, if deemed deposits, should be regarded as "repayable to the depositors on demand or at a fixed time." MoneyGram II, 664 F. App'x at 391; Staunton, 120 F.2d at 933-934. In the normal course, money orders are payable and paid to the payee designated by the money order purchaser. Assuming that the purchaser is deemed "the depositor," the funds would be "repayable to the depositor" only if the purchaser wrote his own name on the "payee" line or returned the money order for a refund, thus forfeiting the fees he had initially paid. Petitioner has submitted no evidence to establish the frequency with which consumers do this.

a "bank" within the meaning of section 581. For purposes of completeness, however, and to ensure that we consider all questions that the Fifth Circuit has directed us to consider on remand, we will address the other two prongs of the Staunton test. Under the second prong, a taxpayer desiring to bring itself "within the commonly understood definition of a 'bank'" must show "the use of deposit funds for secured loans." Staunton, 120 F.2d at 934.

Petitioner contends that the MTAs executed by its money order agents gave rise to "loans." Under these agreements each agent accepted appointment as Trustee for MoneyGram and held money order sale proceeds as Trust Funds for MoneyGram's benefit. However, the agent was not required to remit these funds instantaneously or (except in Wal-Mart's case) the next business day. Most MTAs included a remittance schedule requiring the agent to remit twice weekly, e.g., on Thursday for sales made during the three-day period ending the immediately preceding Tuesday, and on Tuesday for sales made during the four-day period ending the immediately preceding Saturday. Although agents were not supposed to commingle Trust Funds with their other cash, they typically did retain some proceeds, under the normal remittance schedule, for about half a week. MoneyGram contends that the MTAs thus gave rise to "loans."

In advancing this argument petitioner confronts two problems at the threshold. First, given its characterization of the transactions, MoneyGram's ability to satisfy the literal terms of the Staunton test seems questionable. The second prong requires the taxpayer to show "the use of deposit funds for secured loans." MoneyGram II, 664 F. App'x at 391; Staunton, 120 F.2d at 934. On petitioner's theory, the "deposits" are made by the money order purchaser, and the agent holds those deposits for a few days before remitting them to MoneyGram. In this scenario, it does not seem that MoneyGram is "using deposit funds to make secured loans." Rather, it seems that MoneyGram is receiving deposit funds that pay off the loan. The "loan," in other words, appears to be a "deposit" that MoneyGram has not yet received.

Second, respondent contends that judicial estoppel prevents MoneyGram from arguing that the MTAs give rise to loans. In dozens of bankruptcy courts MoneyGram has argued that MTAs create an express trust, not an ordinary debtor-creditor relationship, such that MoneyGram is entitled to favored treatment over other creditors when its agents file for bankruptcy. Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt for "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. sec. 523(a)(4) (2006). MoneyGram has consistently argued--for the most part, successfully--that agents who divert Trust

Funds to their own purposes are guilty of "defalcation," thus rendering their debts to MoneyGram nondischargeable.[13]

In deciding whether to apply judicial estoppel, the Fifth Circuit considers whether: (1) the party against whom estoppel is sought has advanced a legal position plainly inconsistent with a prior litigating position, (2) a court accepted the prior position, and (3) the party did not act inadvertently. See, e.g., Love v. Tyson Foods, Inc., 677 F.3d 258, 261 (5th Cir. 2012). In this Court, petitioner contends that the MTAs give rise to loans that supply "working capital" needed by its small-business agents. Respondent contends that petitioner's current position is "plainly inconsistent" with the position it successfully advanced to bankruptcy courts and that the other two conditions identified by the Fifth Circuit in Love are also satisfied.

In vacating our original opinion, the Fifth Circuit held that we had "erred by failing to apply the appropriate definition of 'loan'" and remanded "for reconsideration consistent with * * * [its] opinion." MoneyGram II, 664 F. App'x at 393,

---

[13]See, e.g., MoneyGram Payment Servs., Inc. v. Sanchez (In re Sanchez), No. 6:09-ap-01536-DS (Bankr. C.D. Cal. 2010); MoneyGram Payment Sys., Inc. v. Choi (In re Choi), No. 1:09-ap-01232 (Bankr. C.D. Cal. 2009); MoneyGram Payment Sys., Inc. v. Hernandez (In re Hernandez), No. 1:07-ap-01114 (Bankr. E.D. Va. 2008); MoneyGram Payment Sys., Inc. v. Laughman (In re Laughman), No. 07-06739-BHL-7 (Bankr. S.D. Ind. 2007).

394. We interpret its mandate as directing us to reconsider, on the merits, whether MoneyGram's transactions with its money order agents gave rise to "loans." We will accordingly proceed to address that question, assuming arguendo that petitioner can surmount the two threshold obstacles we have identified.

Whether an advance of funds constitutes a "loan" for Federal tax purposes arises in a variety of contexts. An advance of funds by a shareholder to his corporation may be a loan or a capital contribution. An advance of funds by a corporation to its shareholder may be a loan or a dividend. An advance of funds by a pension plan to a beneficiary may be a loan or a taxable distribution. And an advance of funds by a mother to her son may be a loan or a gift.

In Welch v. Commissioner, 204 F.3d 1228 (9th Cir. 2000) (cited in Money-Gram II, 664 F. App'x at 393), aff'g T.C. Memo. 1998-121, the question was whether funds received by a taxpayer from a business associate constituted taxable income or a loan. The Ninth Circuit defined a loan as "an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree." Id. at 1230 (quoted in MoneyGram II, 664 F. App'x at 393). In deciding whether funds received by a taxpayer constituted loan proceeds as opposed to taxable income, "[t]he conventional test is to ask whether, when the

funds were advanced, the parties actually intended repayment." Ibid. The Ninth

Circuit noted that courts have considered a number of factors "in assessing

whether a transaction is a true loan," identifying seven factors that may be

relevant. Ibid. The court emphasized that "the factors are non-exclusive" and that

it is necessary to "examine the transaction as a whole." Ibid.

In Todd v. Commissioner, T.C. Memo. 2011-123, 101 T.C.M. (CCH) 1603,

aff'd, 486 F. App'x 423 (5th Cir. 2012), the question was whether funds received

by a taxpayer from a benefit plan constituted a taxable distribution or a loan. We

noted that loan proceeds are excluded from gross income because the "temporary

economic benefit * * * is offset by a corresponding obligation to repay." Id. 101

T.C.M. (CCH) at 1605 (quoting Moore v. United States, 412 F.2d 974, 978 (5th

Cir. 1969)). As an aid in determining whether the advance was a loan that the

taxpayer was obligated to repay, we adopted the same seven-factor test that the

Ninth Circuit had employed in Welch. See ibid.

On appeal of Todd the Fifth Circuit approved use of the Welch seven-factor

test, with the caveat that the factors were "non-exhaustive" and "merely provided a

'general basis upon which courts may analyze a transaction.'" Todd, 486 F. App'x

at 426 (quoting Welch, 204 F.3d at 1230). In other contexts, the Fifth Circuit has

adopted other multi-factor (and partially overlapping) tests to determine whether

an advance of funds constituted a loan as opposed to taxable compensation, a capital contribution, or a dividend.[14] "In applying these factors, each case must be decided on its own unique fact situation." Dillin v. United States, 433 F.2d 1097, 1100 (5th Cir. 1970). "[T]he various factors are not of equal significance and * * * no one factor is controlling." Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972). Multi-factor tests are not "'talismans of magical power,' and the most that can be said is that they prove a source of helpful guidance." Dillin, 433 F.2d at 1100 (quoting Tyler v. Tomlinson, 414 F.2d 844, 848 (5th Cir. 1969)).

In ascertaining whether an advance of funds constitutes a loan as opposed to a capital contribution, a gift, a dividend, or another species of taxable income, the central question is whether the parties intend that the recipient of the funds is ob-

---

[14]See, e.g., Tex. Farm Bureau v. United States, 725 F.2d 307, 311 (5th Cir. 1984) (employing 13-factor test to determine whether advance by shareholder to his corporation was a loan or a capital contribution), rehearing denied, 732 F. 2d 437, 438 (5th Cir. 1984) ("Fifth Circuit law, with respect to distinguishing debt from compensation, is different from the law with respect to distinguishing debt from contributions to capital."); Saunders v. Commissioner, 720 F.2d 871 (5th Cir. 1983) (explaining test for distinguishing debt from compensation), aff'g T.C. Memo. 1982-655; Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n.7 (5th Cir. 1974) (listing nine factors considered by courts to determine whether payment by subsidiary corporation to its parent was a loan or a dividend); Dillin v. United States, 433 F.2d 1097, 1100 (5th Cir. 1970) (employing 11-factor test to determine whether an advance by corporation to shareholder was a loan or a dividend).

liged to repay them. The multi-factor tests discussed above are designed, at least in part, to help answer that question. The question we need to answer is somewhat different. The MTAs explicitly require MoneyGram's agents to pay over the money order proceeds, stating: "Trustee is liable to pay Company all Trust Funds due under this Agreement, in all circumstances." The dispute here concerns not the existence of an obligation to (re)pay--both parties agree that this obligation exists--but the nature of the relationship between MoneyGram and its agents.

The law recognizes many instances in which one party has an obligation to pay funds or return property to another party. This obligation exists (for example) between debtors and creditors, trustees and beneficiaries, bailees and bailors, consignees and consignors, and holders of accounts payable and accounts receivable. In deciding whether the MTAs give rise to "loans," the central question is whether the agents' obligation to pay MoneyGram arises from a debtor-creditor relationship or from some other type of relationship.

As directed by Fifth Circuit, we will apply the seven-factor Welch test in considering whether MoneyGram made "loans" to its agents. See MoneyGram II, 664 F. App'x at 393. We do so cognizant that the seven-factor test is "non-exhaustive," ibid., and that it is necessary to "examine the transaction as a whole," Welch, 204 F.3d at 1230. Since the MTAs explicitly establish the existence of an

obligation to (re)pay, we will focus on the extent to which the factors help illuminate other aspects of MoneyGram's relationship with its agents.

Under the "non-exhaustive seven-factor test" that the Fifth Circuit endorsed in Todd, we look to:

> (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan. [MoneyGram II, 664 F. App'x at 393 (quoting Todd, 486 F. App'x at 426).]

We discuss these factors in turn.

• Note or other instrument: MoneyGram's agents execute an agreement under which they are "liable to pay Company all Trust Funds due under this Agreement, in all circumstances." This agreement, however, does not take the form of a promissory note, but of a "Master Trust Agreement." The agent accepts appointment as "Trustee" for MoneyGram and is referred to as a Trustee (rather than as an "obligor") throughout the instrument. While the agreement explicitly creates an obligation to (re)pay, it indicates that this obligation arises from a trustee-beneficiary relationship, rather than from an ordinary debtor-creditor relationship. See First Nat'l City Bank (Citibank) v. Herpel (In re Multiponics, Inc.),

622 F.2d 725, 728 (5th Cir. 1980) (holding that the presumption of a debtor-creditor relationship is rebutted when funds are "held in a special account or impressed with a trust").

• Interest: The MTAs executed by MoneyGram's agents invariably provide that no interest is charged if the agent remits Trust Funds "in accordance with the remittance schedule for the Service." Most MTAs included a semi-weekly remittance schedule, thus allowing agents to retain Trust Funds for three or four days before remitting them. The fact that MoneyGram does not charge interest during this period supports a finding that these advances were not "loans."

The MTAs vary in their treatment of late payments. Most agreements in the record provide that MoneyGram may charge a fixed-dollar amount (e.g., $40) or "interest at the highest rate allowed by law," whichever amount was greater. Some agreements specify a "service fee" or "late fee" in a fixed-dollar amount (e.g., $75), with interest beginning to accrue if the payment is more than one day late. One agreement provides that "Company shall charge Trustee a late fee of 2% of any late payment of Trust Funds." These late-payment provisions resemble those commonly applied by trade creditors when a consumer neglects to pay an invoice on time. These provisions are consistent with characterization of the agent's obligation as an account payable rather than a loan.

The MTA executed by the Money Store differed from the other MTAs in the record by including a distinct provision permitting "Delayed Remittances." This provision gave the agent the option, twice per calendar year, "to delay its weekly remittance of Trust Funds (representing its weekly money order sales) for a period of no longer than one (1) week (the 'Delayed Remittance')." If the Money Store exercised this option, MoneyGram charged "interest on the Delayed Remittance at a per annum rate equal to 1% above Prime for the use of these funds." Because MoneyGram charged interest at a standard commercial rate on Delayed Remittances, the "interest" factor would support a finding that an agent's exercise of a "Delayed Remittance" option would give rise to a one-week loan.

• Fixed Schedule for Repayment: The MTAs invariably set forth a fixed "remittance schedule." Most MTAs required agents to remit Trust Funds twice weekly, on specified days of the week. As exceptions to this pattern, Wal-Mart remitted money order funds the next business day after they were collected, and the Money Store remitted funds once per week, viz., on Wednesday for sales occurring during the week that ended on the immediately preceding Sunday.

Fixed dates for payment or repayment are common in commercial settings. Most invoices from trade creditors set a fixed date by which customers are expected to pay. Trust agreements often provide fixed schedules for payment of

income and corpus to beneficiaries. Because fixed schedules for payment or re-payment exist in many relationships other than lender-borrower relationships, we find this factor neutral in determining whether the MTAs give rise to "loans."

• <u>Collateral to secure payment</u>: The MTAs include a paragraph captioned "security agreement" in which the agent "grants to * * * [MoneyGram] a continuing security interest in Trust Funds" and (sometimes) in the agent's other assets. Some MTAs grant MoneyGram "all rights of a secured party under the Uniform Commercial Code," and some require the owners of incorporated agents to supply personal guaranties.

Although collateral and personal guaranties are commonly found in loan agreements, they are also found in other types of commercial documents, such as trust instruments. Trustees are sometimes required to provide bonds or other security to secure their obligations to beneficiaries. <u>See, e.g.</u>, Tex. Prop. Code Ann. sec. 113.058 (West 2017); Ga. Code Ann. sec. 53-12-203 (2017); Ohio Rev. Code Ann. sec. 5807.02 (West 2017); Okla. Stat. tit. 60, sec. 175.24(E) (2017); Unif. Trust Code sec. 702(a) (Unif. Law Comm'n 2016). Since the MTAs are explicitly labeled "trust agreements," we find the requirement of collateral to be a neutral factor here.

- <u>Whether repayments were made</u>:  As far as the record reveals, Money-Gram's agents made remittances consistently with their stipulated remittance schedules, except for agents that ultimately filed for bankruptcy.  Because the MTAs obligated agents to pay over Trust Funds, the fact that agents made payments is not surprising.  Obligations to pay arise in many commercial contexts.  The fact that payments were made is consistent with characterizing the agents' obligations as loans, but it is also consistent with characterizing those obligations as accounts payable or trustee duties.  We find this factor essentially neutral here.

- <u>Reasonable prospect of repayment</u>:  MoneyGram investigated the creditworthiness of its agents and sometimes adjusted the terms of the MTA accordingly (e.g., to require faster remittances).  Lenders commonly do this, but it does not indicate that MoneyGram was necessarily making loans.  The MTA required each agent to accept appointment as Trustee for MoneyGram and "to hold Trust Funds separate from Trustee's funds."  In order to satisfy itself that a prospective agent would faithfully discharge his duties as Trustee and not divert Trust Funds to his own use, MoneyGram would naturally investigate the creditworthiness of all prospective agents.  While MoneyGram's behavior is consistent with the existence of a debtor-creditor relationship, it is equally consistent with the existence of a trustee-beneficiary relationship.  We accordingly find this factor neutral here.

• <u>Conduct of the parties</u>:  The conduct of the parties points strongly to the conclusion that the MTAs do not give rise to loans.  In a typical commercial loan the borrower is free to use the borrowed funds for any purpose he wishes.  Loans may contain covenants (e.g., requiring the borrower to maintain specified financial ratios) or negative covenants (e.g., prohibiting the borrower from paying excessive dividends).  Apart from these restrictions, the borrower can usually use the money in his business for any purpose he deems appropriate.

The MTAs prohibit MoneyGram's agents from doing this.  The money order proceeds that they hold for several days are "Trust Funds" that they must keep "separate from Trustee's funds."  If Trust Funds become commingled with other funds, "the total commingled funds are impressed with a trust and shall belong and are payable to [MoneyGram]."  Because the agent is prohibited from deploying Trust Funds in the operation of his business, the conduct of the parties indicates that neither MoneyGram nor its agents regarded amounts remitted pursuant to the regular remittance schedule as "loans."

• <u>Other factors</u>:  As the Fifth Circuit noted, the <u>Welch</u> seven-factor test is "non-exhaustive."  <u>MoneyGram II</u>, 664 F. App'x at 393.  Other factors may be considered as necessary in examining "the transaction as a whole."  <u>Welch</u>, 204 F.3d at 1230.  We believe that two other factors may usefully be considered in

ascertaining the parties' intent, namely: (1) the manner in which the transaction was treated in the parties' books and records; and (2) the parties' subsequent behavior.[15]

There is no evidence in the record to establish how MoneyGram's agents reflected on their balance sheets their remittance obligations under the MTAs. The record clearly establishes, however, that MoneyGram recorded unpaid remittances on its balance sheet, not as "loans," but as "receivables." Companies using an accrual method of accounting have, among the current assets on their balance sheets, accounts receivable from customers, agents, or other persons. Any company having accounts receivable must specify the period within which it expects its customers to make payment. Some invoices may say they are payable immediately; other

---

[15]See Brazoria Cty. Stewart Food Mkts., Inc. v. Commissioner, 48 F. App'x 917 (5th Cir. 2002) (finding in a debt-vs.-equity case that a taxpayer's failure to record advances on its books and records as loans weighed against a determination that the advances were debt), aff'g in part, vacating in part T.C. Memo. 2001-220; Ill. Tool Works Inc. v. Commissioner, T.C. Memo. 2018-121, at *31-*34, *38 (relying in part on taxpayer's treatment of transaction in its books and records to find genuine indebtedness); United States v. Ricard, 922 F.3d 639, 654 (5th Cir. 2019) (finding subsequent conduct a relevant factor in determining intent in a criminal case); Haggerty v. Commissioner, 505 F. App'x 335, 341 (5th Cir. 2013) (finding subsequent conduct with respect to tax compliance a relevant factor in determining whether innocent spouse relief was appropriate), aff'g T.C. Memo. 2011-284; Palmacci v. Umpierrez, 121 F.3d 781, 792 (1st Cir. 1997) (finding in bankruptcy case that a debtor's subsequent conduct was relevant in determining his earlier intent).

invoices may afford the customer 30 days (or some other period) within which to pay. The remittance schedules in the MTAs simply specify the period--generally, half a week--within which agents must transmit money order receipts to Money-Gram. If a payment is late, a late fee of some kind is charged. These features are fully consistent with how MoneyGram characterizes its agents' obligations on its balance sheet, namely, as ordinary accounts receivable rather than as loans.[16]

MoneyGram's conduct when agents fail to satisfy their remittance obligations also seems relevant. On at least 27 occasions MoneyGram agents have filed for bankruptcy. On each occasion MoneyGram has characterized the MTA as creating an express trust that renders its claim against the agent nondischargeable, thus affording MoneyGram favored treatment over the agent's other creditors. See supra p. 10. In so doing, MoneyGram has expressed its understanding--with which most bankruptcy courts have agreed--that the agent's obligation to it arises by operation of law upon the agent's defalcation as Trustee, not from a debtor-creditor relationship of the sort created by an ordinary secured loan.

---

[16]Accounts receivable and loans receivable both appear as assets on a company's balance sheet. But when interpreting the phrase "making loans" for purposes of section 581, we do not consider all "receivables" interchangeable. Rather, we give the phrase "making loans," like the phrase "receiving deposits," a "narrower definition than its broadest possible meaning." See MoneyGram II, 664 F. App'x at 392.

Evaluating these nine factors in the context of MoneyGram's overall relationship with its agents, we find that four factors are neutral as to how the agent's remittance obligations should be characterized. The other five factors point--in several cases very strongly--to the conclusion that agents' payment obligations under their normal remittance schedules do not arise from "loans." We accordingly find that MoneyGram does not "make loans" to its money order agents to the extent the MTAs require them to remit Trust Funds pursuant to the agents' normal (generally bi-weekly) remittance schedules.

One of the nine factors--whether interest was charged--would support the conclusion that any agent availing itself of a "Delayed Remittance" option, of the sort specified in the Money Store MTA, received a one-week "loan" from Money-Gram. As noted supra p. 13, MoneyGram has supplied no evidence concerning the extent to which (if ever) agents actually exercised this option. But even if they did, funds remitted in this way remained Trust Funds that the agent was prohibited from commingling with its other cash or using to operate his business. Because four of the nine factors point to the conclusion that Delayed Remittances, like regular remittances, arose from a trustee-beneficiary relationship rather than a debtor-creditor relationship, we find that any Delayed Remittances likewise were not made in repayment of a "loan."

### 3.     Relationship of Debtor and Creditor

Under the third prong of the Staunton test, a taxpayer desiring to bring itself "within the commonly understood definition of a 'bank'" must show "the relationship of debtor and creditor between the bank and depositor." Staunton, 120 F.2d at 934; MoneyGram II, 664 F. App'x at 391. "The relationship of bank and depositor is that of debtor and creditor, founded upon contract." Bank of Marin v. England, 385 U.S. 99, 101 (1966). Having found that MoneyGram receives no "deposits," we would necessarily find that it cannot meet this third prong because it has no "depositors." But in order to give this third prong independent significance, we will assume arguendo, solely for purposes of considering the third prong of the Staunton test, that MoneyGram does receive deposits.

The first category of supposed deposits is the advances MoneyGram receives from the financial institutions that purchase its "official check" services. These advances are made pursuant to a "payment processing services agreement" executed by MoneyGram and its customer. This agreement provided that MoneyGram would pay interest on the average daily balance of funds advanced by the customer and that any balance remaining at the end of the contract would be returned to the customer. If these advances were considered bank "deposits"--that is, if they were deemed to have been made "for the purpose of safekeeping" by

members of "the general public"--we believe that the relationship of debtor and creditor would exist between MoneyGram and the assumed "depositors." Staunton, 120 F.2d at 934.

We would reach the opposite conclusion with respect to the second category of supposed deposits, which are said to arise in connection with MoneyGram's money order business. If MoneyGram's agents are deemed "the depositors," the relationship of debtor and creditor would not exist between MoneyGram and them. As discussed supra pp. 52-60, the relationship between MoneyGram and its agents is a trustee-beneficiary relationship, not a debtor-creditor relationship.

If the consumer who purchases the money order is deemed "the depositor," the relationship of debtor and creditor typically would not exist between Money-Gram and that person either. In the vast majority of transactions, MoneyGram's creditor will be the payee of the money order, not the purchaser. The purchaser could be classified as the creditor only if he wrote his own name on the payee line or returned the money order for a refund. Petitioner submitted no evidence to establish how often these events occur, but it seems clear that, in the ordinary course of its business, "the relationship of debtor and creditor" does not arise between MoneyGram and the purchasers of its money orders.

B.     Substantial Part of the Business

Our conclusions that MoneyGram does not "receive deposits" and does not "make loans" are sufficient to support our holding that MoneyGram is not a bank "within the commonly understood meaning of that term," MoneyGram II, 664 F. App'x at 389, and thus is not a "bank" within the meaning of section 581. However, to ensure that we consider all questions that the Fifth Circuit has directed us to consider on remand, we will address the second element of the section 581 definition, namely, the requirement that "a substantial part" of the entity's business "consist[] of receiving deposits and making loans and discounts."

Although the case law interpreting section 581 is relatively sparse, the courts have generally been unwilling to define a quantitative metric for the term "substantial part." "Neither section 581 nor the Staunton decision attempts to set forth the minimum number of deposits that an institution must receive and the minimum number of loans that it must make to qualify as a bank." Austin State Bank, 57 T.C. at 188. Shortly after issuing its Staunton opinion, the Fourth Circuit declined to address the "etymology or the analytical definition of the word 'substantial.'" Magruder, 121 F.2d at 983.

The term "substantial part" appears frequently in the Internal Revenue Code and the regulations. In some cases the term is given a bright-line numerical

equivalent. See, e.g., sec. 501(h) (providing that lobbying will not be deemed "a substantial part" of an electing charity's activities if it meets specified numerical tests); secs. 1.170A-9(d)(2)(v)(B), 1.954-2(b)(4)(iv), Income Tax Regs. But in many cases the "substantial part" inquiry is governed by a facts-and-circumstances approach. See, e.g., secs. 1.83-3(a)(2), 1.162-20(b)(1)(ii), 1.170A-9(d)(2)(v)(A), 1.368-1(e)(1)(i), Income Tax Regs.

In deciding whether a substantial part of a taxpayer's business "consisted of receiving deposits and making loans and discounts," we look to the record as a whole. Austin State Bank, 57 T.C. at 188. We apply what "might be called a practical, commercial, functional approach." Magruder, 121 F.2d at 985. Congress' use of the words "substantial part" indicates that we should employ a relative measure rather than an absolute one. Id. at 983 (noting that the statute says "substantial part" rather than "substantial amount").

1. Receiving Deposits

If we were to assume arguendo that MoneyGram receives bank deposits, we would conclude that doing so constituted a "substantial part" of its business. The funds that MoneyGram characterizes as "deposits" equate to the entire dollar volume of its official check and retail money order lines of business. It had more than 1,900 official check customers, and millions of consumers purchased its money

orders. The gross revenues it derived from these activities ($72.2 million in 2007 and $82.5 million in 2008) were dwarfed by the gross revenues it derived from its money transfer line of business ($852.7 million and $1 billion, respectively), which it concedes did not involve banking. But under the approach the courts have generally employed in answering this question, we would conclude that, if MoneyGram were regarded as receiving bank deposits, that activity would be "a substantial part" of its business.

2.     Making Loans

If we were to assume arguendo that the MTAs gave rise to "loans," we would conclude that making loans did not constitute a "substantial part" of MoneyGram's business. MoneyGram did not charge interest on remittances that its agents made pursuant to their regular (generally bi-weekly) remittance schedules. It charged late fees and/or interest only if the remittances were untimely, and it has supplied no evidence to establish the dollar amounts of any late fees or interest it received during 2007 and 2008. Banks commonly derive a large percentage of their revenue from making loans. As far as the record reveals, Money-Gram derived zero income from doing so.

Any MTA that offered a "Delayed Remittance" option required payment of interest if the agent opted for a one-week "loan." But MoneyGram has submitted

no evidence to establish: (1) whether any agent, other than the Money Store, had an MTA with this option; (2) how often (if ever) the Money Store or other agent exercised a "Delayed Remittance" option; or (3) how much interest (if any) MoneyGram received annually on account of "Delayed Remittances." As far as the record reveals, MoneyGram likewise derived zero income from this activity.

Nor has MoneyGram shown that the supposed "loans" were important to its business in a qualitative sense. Its agents may have achieved some cost savings by remitting Trust Funds bi-weekly, rather than the next business day as Wal-Mart did. But MoneyGram has not quantified that cost saving or demonstrated that it was an important factor in recruiting agents to sell its money orders. MoneyGram asserts that its agents relied on these three- or four-day "loans" as a source of working capital for their businesses. But the MTAs barred agents from using Trust Funds as working capital, requiring that money order receipts be kept "separate from Trustee's funds" and not commingled with the agent's cash. MoneyGram's assertions aside, there is no evidence in the record that agents placed significant value on their option to retain money order receipts for three or four days before remitting those funds.

3.    Making Discounts

The second element of the section 581 definition inquires whether a substantial part of the entity's business consists of receiving deposits and "making loans and discounts."  We did not consider, in our original Opinion, whether MoneyGram was "making discounts," and neither party addressed that question on appeal.  The Fifth Circuit noted that "[t]he statute's use of the conjunctive 'and' rather than the disjunctive 'or' in this phrase indicates that 'discounts' is a required element."  MoneyGram II, 664 F. App'x at 393-394.  The Fifth Circuit directed that we consider on remand "whether MoneyGram satisfies this component of § 581."  Id. at 394.

The phrase "making discounts" might be described as somewhat old-fashioned terminology.  The definition of "bank" in section 581 dates back to 1936.  See supra p. 31.  During earlier times the banking business was conducted differently in some respects than it is now.

If a bank customer needing immediate cash held a "bill" or promissory note from a third party (perhaps due in 180 days), he might ask his bank to "discount" the bill by giving him (say) 90 cents on the dollar in exchange for the bill.  As the Supreme Court explained in 1823, "a discount by a bank means, ex vi termini, a deduction or draw-back made upon its advances or loans of money, upon negoti-

able paper, or other evidences of debt, payable at a future day, which are transferred to the bank." Fleckner v. Bank of U.S., 21 U.S. (8 Wheat) 338, 350-351 (1823). In effect, a "bank discount" is the "interest that a bank deducts in advance of the maturation of a note." Black's Law Dictionary (11th ed. 2019). The bank's customer receives proceeds reduced by the unstated interest, and the bank receives the unstated interest when the note is repaid at maturity.

State regulators required that MoneyGram invest its reserve assets in cash or highly-rated debt securities. During 2007 and 2008 MoneyGram held substantial investments in asset-backed securities and CP. It contends that its investments in these securities involved "making discounts." We consider these contentions in turn.

### a. Asset-Backed Securities

Asset-backed securities were typically issued by a trust or a special-purpose entity to which a pool of residential mortgage (or other) loans had been contributed. The trust issued, typically to underwriters, debt securities backed by these loans, and the underwriters sold the securities to investors. MoneyGram might purchase an interest in an asset-backed security from the underwriter, or it might purchase such securities from broker-dealers. In either case the security might be

priced at a discount to the aggregate principal balance of the underlying mortgages.

We conclude that MoneyGram did not "make discounts" when it invested in asset-backed securities. A bank that "makes a discount" by purchasing a customer's note in effect lends money to that person, deducts unstated interest from the customer's proceeds, and receives the unstated interest when the note matures. MoneyGram did not do any of these things when it purchased asset-backed securities from underwriters or broker-dealers.

When MoneyGram purchased an asset-backed security, that security might have been trading at a discount to its face value. But this market discount would not equate to unstated interest. Rather, it might reflect (among other things) the fact that interest or inflation rates had increased during the interim, that economic conditions had deteriorated, or that the loans backing the security were perceived by investors as having declined in value owing to increased risk of default. Unlike a bank making a discount, MoneyGram did not acquire ownership of any existing promissory note and had no rights in the event of default on any individual mortgage.[17]

---

[17]Conceivably, some "discounting" may have occurred when the issuer of the asset-backed security assembled the pool of loans backing it. But MoneyGram

(continued...)

"Discounting" in its broadest sense occurs in all forms of investing. Theoretically at least, stocks are priced at the discounted present value of all expected future streams of income. See John A. Bogdanski, Federal Tax Valuation, ch. 3, para. 3.05 (2019 Westlaw FTVWGL). For bonds and other debt securities, discounting reflects both an imbedded interest rate for the time value of money and the expected risk of default. Discounting is ubiquitous in the investment markets and cannot be understood to mean that every investor who purchases a security at a discount "makes discounts" within the meaning of section 581.

As used in section 581, the term "making discounts," like the term "deposits," must be given "a narrower definition than its broadest possible meaning." MoneyGram II, 664 F. App'x at 392; cf. Valley Morris Plan, 305 F.2d at 616 ("[T]he term 'deposit' always has had a meaning of its own, 'peculiar to the banking business, and one that the courts should recognize and deal with according to commercial usage and understanding.'" (quoting Elliott v. Capital City State Bank, 103 N.W. 777, 778 (Iowa 1905))). "Making discounts" must be interpreted as referring to the type of activity in which banks engaged when they discounted

_____

[17](...continued)
had nothing to do with this. It was an investor; it purchased an investment interest in the security after any preliminary discounting had already occurred.

promissory notes for their customers. MoneyGram did not "make discounts" when it purchased asset-backed securities as an investor.

b.      Commercial Paper

In the U.S. financial market, CP refers to unsecured promissory notes issued by corporations with a fixed maturity of no more than 270 days. At year-end 2007 the outstanding volume of CP in the U.S. market, issued by several thousand corporations, exceeded $1.78 trillion. See supra p. 21. CP is invariably issued at a discount to the face amount of the obligation. The discount--referred to as "original issue discount" (OID)--represents unstated interest that the investor receives when he sells the instrument or receives its face amount at maturity. For Federal tax purposes, OID is generally taxed as ordinary income. See sec. 1271(a)(4).

MoneyGram invested in CP to earn a return on cash balances that it held pending clearance of money orders and official checks through the banking system. During 2007 MoneyGram purchased CP on about 2,400 occasions, typically from broker-dealers or other agents, including Bear Stearns, Merrill Lynch, and Citigroup. MoneyGram identified 118 occasions during 2007 in which it purchased CP directly from the issuer. On 88 of these occasions the CP had a maturity of one day (sometimes referred to as overnight CP); on the other 30 occasions the CP had maturities ranging from two days to seven days. The aggregate dollar

value of the CP MoneyGram purchased directly from issuers during 2007 was about $5.8 billion. It earned income of approximately $1.2 million during 2007 from these CP investments, all in the form of OID.

We conclude that MoneyGram did not "make discounts" when it purchased CP from broker-dealers. In making these investments MoneyGram did not lend money to a customer by discounting a note. Any lending was done by the underwriters who initially purchased CP from the issuer. By acquiring CP in the aftermarket, MoneyGram was not lending to the corporation that issued the CP but was simply acquiring an asset from another investor. The fact that MoneyGram--like all other investors in the $1.78 trillion CP market--would receive OID as part of its investment return does not mean that it was "making discounts" within the meaning of section 581. Money market funds held massive investments in CP during 2007 and 2008, but they could not plausibly contend that they "made discounts" for purposes of this statute.

Assuming arguendo that MoneyGram's purchases of CP directly from issuers involved "making discounts," we find that petitioner has not shown that investing in such CP was a "substantial part" of its business, either in a quantitative or in a qualitative sense. Over the course of 2007 MoneyGram invested more than $66 billion in CP, about 8.5% of which it purchased directly from the issuer.

Of the $5.7 billion purchased directly from issuers, MoneyGram's exposure was typically only one day and never more than seven days. From this $5.7 billion investment MoneyGram earned OID of $1.2 million during 2007. Relative to MoneyGram's revenues generally, this amount is insubstantial.

Taking a practical, commercial approach to this question, we conclude that "making discounts" did not constitute a "substantial part" of MoneyGram's business. A contrary holding would enable insurance companies, money market funds, and countless other investors who held investments in CP to claim that they satisfied this requirement for "bank" status under section 581. Congress plainly did not intend the statute to be interpreted in this way. See H.R. Rept. No. 77-2586, at 45 (1942), 1942-2 C.B. 701, 708 (explaining the removal of insurance companies from the definition of a "bank" in section 581's predecessor).

IV.    Conclusion

During the financial crisis many institutions experienced losses on their investment securities. But only "banks" as defined in section 581 were entitled to claim ordinary (as opposed to capital) losses. As the Fifth Circuit explained, an entity must satisfy each of three distinct requirements in order to qualify as a "bank" within the meaning of this provision. First, the entity must be "a bank or trust company," which means that it must have the essential characteristics of a

bank as that term is commonly understood. Second, "a substantial part" of the entity's business must "consist[] of receiving deposits and making loans and discounts." Third, the entity must be "subject by law to supervision and examination" by Federal or State authorities having supervision over banking institutions. See MoneyGram II, 664 F. App'x at 388-392.

We hold that MoneyGram during 2007 and 2008 was not a "bank" for purposes of section 581 because it was not a bank within the ordinary meaning of that term and because a substantial part of its business did not consist of "receiving deposits and making loans and discounts."[18] Because petitioner for that reason was not entitled to deduct bad debt losses against its ordinary income on the write-down of its asset-backed securities, we will grant respondent's motion for summary judgment and deny petitioner's cross-motion.

To implement the foregoing,

Decision will be entered under Rule 155.

_____

[18]In most or all States MoneyGram appears to be "subject by law to supervision and examination by State * * * authority having supervision over banking institutions." Sec. 581. Respondent contends that MoneyGram nevertheless fails to satisfy the third statutory requirement because it is not regulated by any banking authority as a bank. In our original Opinion we found no need to address this question, MoneyGram I, 144 T.C. at 16 n.7, and we likewise do not address it here. The Fifth Circuit did not discuss the third statutory requirement and did not direct us to consider it on remand.